319 So.2d 361 (1975)
STATE of Louisiana
v.
Darryl NICHOLAS.
No. 56438.
Supreme Court of Louisiana.
October 1, 1975.
Samuel S. Dalton, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Ronald P. Loumiet, Keith S. May, Asst. Dist. Attys., Abbott J. Reeves, Director, Research and Appeals Division, Gretna, for plaintiff-appellee.
CALOGERO, Justice.
Defendant, Darryl Nicholas, was indicted and tried for first degree murder of a grocery store owner in an incident which occurred on January 16, 1974. Although he was facing a capital verdict in the event of conviction of the crime charged, the jury which tried him on May 15, 1974 returned a unanimous verdict of guilty of second degree murder. Defendant received a life sentence without benefit of parole, probation or suspension of sentence before serving twenty years.
Defendant perfected eight bills of exceptions and assigned each of them as error in connection with his appeal. In brief, he has abandoned all but Bills Nos. 1, 5 and 6, and the substance of those bills (Nos. 1, 5 and 6), relating to the voluntariness of his confession, insofar as made part of Bill No. 7 (Motion in Arrest of Judgment) and Bill No. 8 (Motion for a New Trial).[1]
*362 Bills of Exceptions Nos. 1, 5 and 6 all relate to defendant's confession. Bill No. 1 was taken when the trial court denied defendant's Motion to Suppress; Bill No. 2, when the court overruled a defense objection and allowed the confession into evidence during the trial; and Bill No. 6, when the trial court denied the motion for a directed verdict made by the defense upon the state resting its case.[2] The same contention relative to defendant's confession and its inadmissibility was made part of defendant's Motion in Arrest of Judgment (Bill No. 7) and his Motion for a New Trial (Bill No. 8).
Defendant contends that the confession was inadmissible because the state failed to carry its burden of proving that the confession was voluntarily, knowingly, and intelligently given. His principal contention is that he could not and did not understand his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), due to mental retardation. Following a hearing on the motion to suppress, the trial court overruled the motion, concluding that defendant had the necessary mental abilities to understand his constitutional rights as they were explained to him and further concluding that defendant was neither physically nor mentally coerced into giving his confession. It is the ruling of the trial court that defendant was able to understand and to waive his constitutional rights which we here review. Defendant has not argued on appeal that he was physically coerced into giving the confession.
The pertinent facts surrounding the giving of the confession were adduced at the hearing on the motion to suppress as follows: On February 7, 1974, at 11:15 p.m., defendant and an accomplice, Gregory England, were arrested by Jefferson Parish deputies for the armed robbery of a motel.[3] At about 12:30 a.m. on February 8, 1974, Officer Peter M. Pellegrini, Jr. interrogated defendant at the Westbank lockup. Officer Richard Cantin was also present on this occasion, but he did not participate in the interrogation. Initially, defendant denied involvement in the armed robbery. His statement to that effect was taken and he was returned to the booking area of the lockup. The statement was then shown to the alleged co-perpetrator of the armed robbery, Gregory England, and England proceeded to give the officers who were interrogating him a complete statement on both the armed robbery and the instant, separate crime of murder. Officer Pellegrini decided on the basis of the England confessions to reinterrogate defendant. He did so and ultimately procured two confessions, one to the armed robbery charge and the other to the instant murder charge.
At the outset of interrogation, Officer Pellegrini read defendant his rights from a Rights of Arrestee form.[4] Officer Pellegrini *363 testified that he read the form aloud to defendant after determining that defendant was unable to read it himself. He further stated that defendant indicated he understood some of the rights as they were read to him, and that he did not understand others. In each of the latter instances, Officer Pellegrini testified that he gave a further explanation until defendant indicated that he understood.
Following Officer Pellegrini's testimony the state put on the stand Officer Cantin and Officer Williams. Officer Cantin testified that his purpose in being present at the interrogation was to witness the proceedings and to assist Officer Pellegrini if necessary. He stated that defendant was not mistreated in any way and further testified that defendant indicated he understood his rights as they were read to him by Officer Pellegrini. Officer Williams was the arresting officer and his testimony was limited to the fact that defendant was not mistreated during the arrest and transportation to the Westbank lockup. He did not participate in or witness the interrogation of defendant.
The above was the evidence presented by the state. The defense put on two witnesses, the defendant's sister, Patricia Nicholas Brooks, and Dr. Nathan N. Lubin. Mrs. Brooks simply testified that she helped to raise her brother after their mother's death and that to her knowledge her brother was illiterate. She testified that he went to the fourth grade in school, and that he could never understand very much due to his limited education. She said she thought he could write his name. As far as she knew, defendant had never worked other than assisting their grandfather cut grass.
Dr. Lubin, a clinical psychologist whom the court qualified as an expert in his field, testified that with the authorization of defendant's attorney, he conducted a psychological evaluation of defendant. He administered the Wexler Adult Intelligence Scale Test, the Bendiken Star test, and the Rorschach Test. The Wexler test measures intelligence quotient, the Bendiken Star measures perception impairment which may be the result of a neurological problem, and the Rorschach is a personality evaluation test. The three tests were given separately. Based on the psychological tests alone, Dr. Lubin testified that he was able to and did conclude that defendant had an IQ of 65 and was thus mentally retarded, that there were indications that defendant suffered some type of neurological impairment, and that defendant was a severely emotionally disturbed individual, in that he compensates for a sense of inadequacy by being aggressive and hostile.[5]
Defendant introduced into evidence as exhibits the Rights of Arrestee form, and the Voluntary Statement form (which incorporates the defendant's confession) with its waiver of rights language.[6] Dr. Lubin examined the exhibits and testified that in *364 his opinion, based upon defendant's intelligence quotient (and without testing for and determining defendant's educational achievement level), defendant was incapable of understanding the Rights of Arrestee form, or the Waiver of Rights form, assuming that the forms were orally read verbatim to him. On cross-examination, he testified that defendant could be made to understand the rights detailed in the forms if they were explained to him in simple, primitive language, on the second or third grade level. No other evidence was presented on the motion. Defendant did not take the stand.
On the basis of the above evidence, the trial judge denied the motion to suppress the confession, for the reasons, as stated in his per curiam to Bill of Exceptions No. 1, that "defendant had the necessary mental ability to understand his constitutional rights as they were explained to him and that the defendant was neither physically nor mentally coerced into giving his confession."
We are not here reviewing any assignments of error having to do with sanity, either at the time the offense was committed, or at the time of trial. Nor are we on this appeal presented any contention that the confession was the result of any type of force or other coercion. Our sole focus here is upon whether the state met its burden of proving that the confession was voluntary in the sense that it was given after a knowing and intelligent waiver of Miranda rights.
Based on the record before us, we find no error in the trial court's denying the motion to suppress the confession and admitting this confession into evidence. The uncontradicted evidence as to what took place indicates that there was read to defendant and explained a) his right to remain silent, b) his right to talk to a lawyer prior to and/or during questioning, c) his right to have an appointed lawyer if he could not afford one, d) if he agreed to interrogation without the benefit of an attorney, his right to stop answering questions at any time until he had spoken with a lawyer, and e) that anything he said could be used against him.
The sole contention of defendant is that the state did not show that words sufficiently simple and primitive and within defendant's capacity to understand (in light of Dr. Lubin's testimony) were used by Officer Pellegrini in the rights advice which was given. This problem of the mild mental retardate's comprehension, the sufficiency of rights warnings, and confession admissibility is a difficult one. We have stated in State v. Edwards, 257 La. 707, 243 So.2d 806 (1971), that
"Moderate [mental] retardation and a low intelligence quotient do not of themselves vitiate the ability [of a defendant] to knowingly and intelligently waive constitutional rights and make a free and voluntary confession."
We acknowledged inferentially in that case, however, that a given set of proven facts and circumstances might surely establish that a given defendant did not in fact understand the warnings, and accordingly that his confession or statement could not be treated as a free and voluntary one.
The state's case has not been offset by the limited test results and psychological testimony, particularly inasmuch as that very evidence was to the effect that defendant could understand his rights if simply explained, and the state has shown that the rights were indeed explained and acknowledged to have been understood. Absent contrary evidence[7] on defendant's *365 actual comprehension, we accept as sufficient Officer Pellegrini's testimony.[8]
On the unique facts of the instant case we find defendant's confession knowingly, intelligently and voluntarily given and thus admissible.
Accordingly, the conviction and sentence are affirmed.
NOTES
[1] Bill No. 2, relative to the exclusion of women from the petit jury venire, was abandoned in light, of Daniel v. Louisiana, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975) and State v. Rester, 309 So.2d 321 (La.1975) Bill No. 3, attacking the constitutionality of La.R.S. 14:30.1 and its provision for capital punishment, was abandoned because defendant was not sentenced to death. Bill No. 4, directed toward the legality of La.R.S. 14:30.1, was abandoned because the identical contention was found to be meritless in State v. Reado, 295 So.2d 440 (La.1974). The substance of those bills, (Nos. 2, 3, 4) as incorporated in Bill No. 7 (Motion in Arrest of Judgment) and Bill No. 8 (Motion for a New Trial), was likewise abandoned.
[2] The basis for the motion for a directed verdict was that allegedly the only evidence against defendant was the involuntary confession.
[3] Defendant was subsequently tried for and convicted of that armed robbery. He has appealed that conviction to this Court, alleging the same error, i.e., the admission of his confession. We have rendered a separate opinion in that case. State v. Nicholas, La., 319 So.2d 365, decision rendered this date.
[4] The rights of arrestee form contained the following:

"(Before we ask you any questions, you must understand your rights.)
You have the right to remain silent. Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer."
[5] Dr. Lubin did not interview defendant, and, of course, he performed no psychiatric or neurological tests. Nor did he administer an educational achievement test to determine defendant's reading and writing ability, but stated he was aware that defendant had only attended the fourth grade.
[6] The pertinent language is the following:

"I do not have to make any statement at all, nor answer any questions or do anything that might tend to go against me or incriminate me in any manner, and that any statement I make may be used against me on the trial or trials for the offense or offenses concerning which the following statement is herein made. I was also warned and advised of my right to the advice and presence of a lawyer of my own choice before or at any time during any questioning or statement I make, and if I am not able to hire a lawyer I may request and have a lawyer appointed for me, by the proper authority, without cost or charge to me.
"I do not want to talk to a lawyer, and I hereby knowingly and purposely waive my right to the advice and presence of a lawyer before and during any questioning or at any time before or while I voluntarily make the following statement to the aforesaid person, knowing that anything I say can and will be used against me in a court or courts of law."
[7] Defendant could have testified, with his examination and cross-examination being limited to the comprehension and voluntariness issue, State v. Sears, 298 So.2d 814 (La.1974), and without such testimony being available for use at the trial on the merits. We do not hold against defendant this fact that he did not testify, but note simply that the state's case on the issue before us was not rebutted.
[8] While we consider sufficient Officer Pellegrini's testimony on the motion to suppress that he "explained" those rights defendant initially said he did not understand, we note with interest the more specific testimony Officer Pellegrini gave during trial on the subject:

"I explained and any time we explain an arrestee form we try to get on the same level or you know use the same type of street language as the suspect or the arrestee has used. In this case I went through part of the rights form as in the first one which says you have a right to remain silent. I then advised him that he did not have to say anything. That he could just sit there and dummy up and not say nothing. Then I said anything can be used against you in Court, I just advised him that if he told me anything that I would burn him with it, that is street talk which meant that I would use that against him and put him in jail with it. I told him that if he wanted an attorney we would get him one and that it was not going to cost him anything. That the Judge is just going to give him one even if he didn't have any bread. And I also told him that he could have him here if he wanted him, that that was up to you. Then I told him if you do want to talk to me and then if you think you are getting in too deep and you want to shut up or you don't want to talk to me anymore you don't have to and that I would just bring him downstairs and just forget about you. That it was clearly and fully up to him."