343 So.2d 118 (1976)
STATE of Louisiana
v.
Richard Norman GLOVER.
Nos. 56812, 56894.
Supreme Court of Louisiana.
February 23, 1976.
On Rehearing January 24, 1977.
Rehearings Denied March 2, 1977.[*]
*119 Robert Glass, Frederick J. Gisevius, Jr., George W. Healy, III, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for Richard N. Glover.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Asst. Dist. Atty., for the State.
MARCUS, Justice.
Richard Norman Glover was indicted by the Orleans Parish Grand Jury on June 29, 1972 for murder in violation of La.R.S. 14:30.[1] Prior to trial, defendant filed a motion to suppress three inculpatory statements that he made during the period of June 13-14, 1972. The trial judge suppressed two written confessions made to the police, but refused to suppress an oral inculpatory statement defendant made to his common-law wife that the police electronically intercepted. We granted the application of both the state and defendant for certiorari. 321 So.2d 361 (La.1975).

FACTS
On December 24, 1971, Cynthia LeBouef was raped and murdered in New Orleans. Approximately six months later, in June of 1972, the St. Bernard Parish Sheriff's office received information from several confidential informants indicating that defendant had committed this crime. At that point in time, defendant's common-law wife, Linda Bently, contacted Captain Louis Reichert of the St. Bernard Parish Detective's office. She told him that she had left defendant and had fled into Plaquemines Parish in fear for her life, and that she suspected defendant of having raped and murdered Cynthia LeBouef. She agreed to have a wireless transmitter, or microphone, attached to her person so that the police could monitor defendant's statements. On June 13, 1972, at about 6:00 p.m. she met defendant at a parking lot in St. Bernard Parish. In a car nearby, eavesdropping on the conversation between Glover and his common-law wife by means of an electronic device, were Deputy Sheriff George Bethea and Officer Louis Reichert of St. Bernard Parish, and Patrolman Preston Reuter of the New Orleans Police Department. During the conversation, defendant asked Linda Bently why she would not return to him. She replied, "Well, Richard, the reason why I haven't returned to you is that I heard that you killed that little white girl, killed and raped that little white girl," whereupon Glover said, "No, I didn't kill her. Tater killed her, but I was there." This inculpatory statement having confirmed their suspicion *120 that defendant was involved in the murder of Cynthia LeBouef, the police officers immediately took defendant into custody, orally advised him of his Miranda rights, and transported him to the St. Bernard Parish courthouse. At the sheriff's office, defendant was again advised of his Miranda rights about 7:00 p.m. After signing a waiver-of-rights form, he then executed a typewritten confession in which he admitted that he was present when the crime was committed, but insisted that another person (whom he called "Tater") had actually raped and murdered the victim. At about 9:00 p.m., defendant was taken from the courthouse to the Orleans Parish coroner's office. En route, he spontaneously pointed out to the police the scene of the crime. After he was examined by the coroner, he was turned over to the Orleans Parish authorities at Central Lockup. The next day (June 14) at about 5:00 p.m., after being fully advised of his rights, he made a second typewritten confession, in which he admitted that he himself had perpetrated the offenses.
At the conclusion of the trial of the motion to suppress held on May 30, 1975, the trial judge ruled that defendant was insane at the time he made these inculpatory statements and suppressed the two written confessions obtained while defendant was under police custody. On the other hand, he held that the oral inculpatory statement made to his common-law wife was admissible because it was not made while defendant was in police custody, stating in his reasons for judgment that the jury could determine what "weight and credibility" they wished to give to this statement.

I.
Before a confession or inculpatory statement can be introduced in evidence, it must be affirmatively shown by the state that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451. See also La. Const. art. 1, § 11 (1921), in effect at the time of the alleged offense; La. Code Crim.P. art. 703(C) (1966). The admissibility of a confession or an inculpatory statement is a question of law for the trial judge to determine; the weight to be given it is a question for the jury. State v. Sears, 298 So.2d 814 (La.1974); State v. Simpson, 247 La. 883, 175 So.2d 255 (1965); State v. Kennedy, 232 La. 755, 95 So.2d 301 (1957). Therefore, only after the trial judge has decided that the state has satisfied its burden of proving that a confession or inculpatory statement was free and voluntary may it be introduced in evidence.[2]
The trial judge felt that defendant's inculpatory statement to his common-law wife, because it was precustodial, was not subject to the requirement that it be found free and voluntary under the standards set forth above before its admission in evidence. In this respect, we believe he erred. The provisions of Louisiana law establishing that only free and voluntary confessions and inculpatory statements are admissible draw no distinction between those made before and after the accused is taken into police custody. La. Const. art. 1, § 11 (1921); La.R.S. 15:451; La.Code Crim.P. art. 703(C) (1966). We have defined an "inculpatory statement" as one that refers to the out-of-court admission of incriminating facts made by the accused after the crime has been committed. It relates to past events. State v. Fink, 255 La. 385, 231 So.2d 360 (1970). Defendant's inculpatory statement to his common-law wife, made almost six months after the crime with which he is charged occurred, incontestably falls within this definition.[3] The state is *121 not required, it is true, to show when it seeks to introduce a noncustodial inculpatory statement in evidence that the accused had been advised of his Miranda rights before it was made. State v. Roach, 322 So. 2d 222 (La. 1975). It still has the duty, however, of affirmatively showing that a noncustodial confession or inculpatory statement is free and voluntary. Therefore, the trial judge erred in ruling that it was unnecessary for the prosecution to lay this foundation and for him to rule thereon prior to the introduction of defendant's inculpatory statement to his common-law wife in evidence.

II.
While stating that he was uncertain whether the state or the defendant has the burden of proving insanity at the trial of a motion to suppress, the trial judge concluded that defendant had in fact proven his insanity at the time he made the inculpatory statement and confessions by a preponderance of the evidence. We disagree with this finding.
While La.R.S. 15:451 and article 703(C) of the Code of Criminal Procedure impose the burden upon the state of proving that a confession or inculpatory statement is free and voluntary, La.R.S. 15:432 provides that an evidentiary legal presumption exists that a defendant is sane and responsible for his actions. La.R.S. 15:432 further provides that a legal presumption relieves him in whose favor it exists, in this case the presumption of sanity in favor of the state, from the necessity of any proof. Reading these provisions in pari materia, we believe that, in order to rebut the presumption of sanity, the accused has the burden of proving by a preponderance of the evidence his insanity at the time he made a confession or inculpatory statement. See La.Code Crim.P. art. 652 (1966) and Official Revision Comment thereto.[4]
At the hearing on the motion to suppress, defendant called only one witness, Dr. Kenneth A. Ritter, a psychiatrist. Dr. Ritter was the member of a sanity commission appointed to determine defendant's mental capacity to stand trial. He did not examine defendant until September 14, 1972, at which time he found defendant insane. However, this examination did not take place until three months after defendant made the inculpatory statement and confessions at issue (June 13-14).
Dr. Ritter's testimony at the motion to suppress was equivocal with regard to defendant's mental condition on June 13-14, 1972. He testified that defendant suffered from chronic schizophrenia, and that this psychosis would have been present in June. Yet, he also stated that there are varying degrees of psychosis and that all psychotics are not legally insane. Dr. Ritter admitted on cross-examination that, because schizophrenia is a progressive illness, defendant's psychosis was possibly not as severe in June as in September and could have been present in a lesser degree.
At no point in his testimony did Dr. Ritter express with certainty his professional opinion that defendant's psychosis had developed into what would be characterized as legal insanity by June, 1972. On direct examination, he was questioned regarding an earlier report to the court that he had made with Dr. Gene Usdin, another psychiatrist. In this report, he concluded that defendant was "probably" insane at the time of the commission of the offense in December, 1971. The portion of the report read at the hearing ended with the following sentence: "However, for the purpose of emphasis, we repeat our lack of certainty about this." We feel that the psychiatrist *122 displayed a similar lack of certainty concerning defendant's mental condition in June, 1972. When asked whether he could express a more positive opinion of defendant's mental condition in June, 1972 (a closer point in time to the September psychiatric examination), he replied that he would be on "firmer gounds . . . in speculating his mental status . . ." because of the closer proximity in time to the examination. (Emphasis added.) He did not thereupon state a definite professional opinion that defendant was legally insane on June 13-14, at which time defendant made the inculpatory statement and confessions sought to be suppressed.
In rebuttal, the state called several lay witnesses who were present and spoke with defendant at the time he made the inculpatory statement and confessions. They uniformly testified that defendant acted coherently and rationally and exhibited no signs of unusual or abnormal behavior. Significantly, defendant, who has the burden of proving insanity, failed to call his sister (who was present at the time he executed the written confession in Orleans Parish on June 14) or his common-law wife (to whom he made the oral inculpatory statement on June 13) at the hearing on the motion to suppress. Nor did he call Dr. Carl Rabin, the Orleans Parish coroner, who gave defendant a physical examination on the night of June 13. These persons, having seen and been familiar with defendant in June, 1972, would have been, able to shed further light on his condition at that time. Additionally, no evidence was adduced at the hearing that defendant had any prior history of mental illness.
Under these circumstances, we do not find that defendant has borne the burden of proving by a preponderance of the evidence his insanity at the time he made the inculpatory statement and confessions on June 13-14. He has failed to overcome the presumption in favor of his sanity. Thus, the trial court erred in concluding otherwise.
Furthermore, we find that the state has affirmatively shown that the oral inculpatory statement and the two written confessions were free and voluntary. The noncustodial statement made by defendant to his common-law wife on June 13 was spontaneous and did not result from police interrogation. Defendant's in-custody confessions were made after being fully advised of his Miranda rights. On the night of June 13, he made a written confession immediately after being advised of his rights; and on June 14, he executed the second confession after about an hour of interrogation. The police officers present at the time the inculpatory statements were made testified as to the free and voluntary manner in which they were confected and denied the existence of any influence of fear, duress, intimidation, menaces, threats, inducements, or promises. Defendant offered no evidence to dispute their testimony. In absence of such evidence, and in absence of sufficient evidence to overcome the presumption of sanity, we conclude that the inculpatory statement and confessions made on June 13-14 were free and voluntary.[5]
We must next determine whether defendant knowingly and intelligently waived his privilege against self-incrimination *123 before he executed the in-custody confessions. Dr. Ritter testified at the hearing on the motion to suppress that defendant was illiterate and possessed a mentality that bordered on mental retardation. These factors do not preclude a knowing and intelligent waiver of the privilege against self-incrimination. State v. Neal, 321 So.2d 497 (La.1975); State v. Nicholas, 319 So.2d 361 (La.1975); State v. Edwards, 257 La. 707, 243 So.2d 806 (1971). Because defendant appeared to be uneducated, Captain Reichert, the arresting officer who participated in the taking of the June 13th written statement and witnessed defendant's signing of a waiver-of-rights form, testified that, after reading to defendant the printed form advising him of his rights, he explained him his rights a second time in greater detail. He further testified that defendant was able to read part of the printed form aloud. Likewise, Officer Sam Gebbia testified that defendant was fully advised of his Miranda rights which defendant acknowledged that he understood prior to making the written confession on June 14. On being questioned regarding defendant's ability to comprehend his Miranda rights, Dr. Ritter responded that in his opinion defendant was capable of comprehending the essence of these rights. Hence, we conclude that defendant knowingly and intelligently waived his Miranda rights prior to making the in-custody confessions.

III.
Finally, defendant contends that the trial judge erred in refusing to suppress his oral inculpatory statement made to Linda Bently, his common-law wife, and intercepted by the police by means of an electronic device. He claims that, absent proof of Linda Bently's consent to the electronically intercepted conversation as required by the fourth amendment and 18 U.S.C. § 2510 et seq., the intercepted statement is inadmissible.
In United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Supreme Court found no violation of the fourth amendment where the communications between the defendant and an informant were overheard by governmental agents by monitoring a radio transmitter carried by and concealed on the informant. The Court further held that the testimony of the governmental agents relating to these intercepted conversations did not violate defendant's fourth amendment rights.
18 U.S.C. § 2510 et seq., which prohibits the electronic interception of an "oral communication"[6] without antecedent judicial authorization, permits a law enforcement officer to intercept such an "oral communication" without prior judicial authorization if one of the parties to the communication consents thereto. 18 U.S.C. § 2511(2)(c) states:
It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.
At the hearing on the motion to suppress, Captain Louis Reichert, who arrested defendant on June 13, testified that he had questioned Linda Bently, defendant's common-law wife. She told him that she had left defendant and fled to Plaquemines Parish in fear for her life. She also expressed to him her suspicion that defendant was involved in the rape and murder of Cynthia LeBouef. Deputy *124 Sheriff George B. Bethea, who also participated in defendant's arrest, testified on cross-examination by defense counsel that Linda Bently had contacted Captain Reichert, had given her consent to the placing of a transmitter on her person, and had agreed to ask defendant certain questions in order to elicit from him incriminating responses. Deputy Sheriff Bethea further testified that he, Patrolman Reuter, and Captain Reichert witnessed Linda Bently meet defendant at a St. Bernard Parish parking lot, whereupon she engaged in such a conversation with him in accordance with previous arrangements she had made with Captain Reichert. As they conversed, the officers intercepted their conversation from a nearby location in their police car. No evidence was adduced at the hearing to dispute the fact that Linda Bently consented freely and voluntarily to the interception of her conversation with defendant.
We therefore conclude that the state proved her consent to the police eavesdropping operation at the hearing on the motion to suppress. Accordingly, the interception of defendant's oral inculpatory statement violated neither the fourth amendment nor 18 U.S.C. § 2510 et seq., and the intercepted inculpatory statement is admissible.

DECREE
For the reasons assigned, we reverse the ruling of the trial judge suppressing the oral and written confessions made on June 13-14, 1972; we affirm the trial judge's ruling that the oral inculpatory statement made by defendant to his common-law wife on June 13 is admissible. We rule that the oral and two written confessions made on June 13-14, 1972 are admissible. The matter is remanded to the trial court for further proceedings not inconsistent with this opinion.
DIXON, J., dissents.
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice (dissenting).
I respectfully dissent from the opinion of the majority in this case which holds, among other things, that the statements at issue are admissible because defendant Richard Glover was sane at the time they were made. Dr. Ritter testified at length that Glover was an insane man, and the trial judge concluded that defendant had in fact proven he was insane at the time he made the statements/confession. The majority's interpretation of the psychiatrist's testimony to hold that he was uncertain whether Glover was insane is in my view obviously incorrect.

ON REHEARING
DENNIS, Justice.
On December 24, 1971 Cynthia LeBouef was raped and murdered in Orleans Parish. In June of 1972 three unidentified informants, whose reliability does not appear from the record, told St. Bernard Parish sheriff's deputies that Richard Norman Glover was involved in the crime. Further investigation revealed that Glover resided nine blocks from the scene of the crime. Upon questioning, Glover's former common-law wife, who had left him and gone to Plaquemines Parish, told the officers that Glover was oversexed, that he had once imprisoned her in a house and that she suspected Glover had committed the offenses against LeBouef. However, she did not report that Glover had ever admitted any involvement in the rape-murder.
At the request of his former commonlaw wife, Glover met and talked to her in the parking lot of a business establishment in St. Bernard Parish on June 13, 1972. A wireless transmitter and microphone *125 were concealed on her person enabling law enforcement officers in a car parked nearby to eavesdrop on their conversation. According to the officers, Glover asked her why she would not return to him, and she replied, "Well, Richard, the reason why I haven't returned to you is that I heard that you killed that little white girl, killed and raped that little white girl." To this, the officers said Glover responded, "No, I didn't kill her. Tater killed her, but I was there." The officers then immediately drove up, arrested Glover and advised him of his constitutional rights.
The arrest occurred at approximately 6:00 p.m. on June 13, 1972. Glover was taken to the St. Bernard courthouse and again advised of his rights. That night at about 7:30 p.m., a police officer interrogated Glover in the presence of one or two assistant district attorneys and a stenographer. According to the stenographer's transcription Glover said that on December 24, 1971 in New Orleans, he and a person he called "Tater" got off a bus through its rear door near a corner drug store at the same time a white girl exited through the front door; that Tater grabbed her and beat her head against the concrete building; and that Glover tried but did not succeed in stopping him.
In this first typewritten statement, which was introduced as an exhibit, we find the following passage:
"Q. In the beginning of your statement you mentioned the subject by the name of Tater. I now show you a B. of I. photograph No. 130859, is this the same subject that you mentioned in your statement, and if so do you know his real name.
"A. That's him. James that's all I know him by."
Curiously, however, this identification of Tater by photograph was never mentioned during the later motion to suppress hearing, and there is no evidence in the record to indicate whether the police questioned or investigated the individual depicted by the photograph.
After the interrogation Glover was placed in a patrol car at about 9:15 p.m. to be transported to the Coroner's Office in Orleans Parish. According to the officers in the car, while en route, Glover without any prompting offered to show them where the girl had been killed. According to them, he pointed out a drug store parking lot where he said Tater had beaten her and showed them how Tater dragged her across the street to a fried chicken store, where he said Tater swung her up against a metal container as though she were a baseball bat. Glover was taken to the Orleans Parish Coroner's Office, where he was examined briefly at about 12:15 a.m., and then to the New Orleans Central Lockup.
The next day, June 14, 1972, New Orleans police officers resumed interrogation of Glover at about 2:15 p.m. The record does not reflect the intensity and details of this interrogation before officer Sam Gebbia took over the questioning at about 5:00 p.m. After approximately one hour under his interrogation, Glover agreed to give an additional written statement. He then gave a statement substantially consistent with his prior one in which he again named Tater as the assailant. However, according to Officer Gebbia, after another hour of questioning Glover admitted that he had struck and raped the girl, that there was no Tater, and that Tater wasn't involved. His statement was reduced to typewritten form, and he signed it after his sister arrived at about 8:15 p.m.
On July 27, 1972, the trial judge appointed Drs. Kenneth A. Ritter and Henry E. Braden, III, to examine Glover for competency to stand trial. Based on their report of October 16, 1972, the court found him lacking in the mental capacity to stand trial, and on October 19, 1973 Glover was committed to the East Louisiana State Hospital. On July 25, 1973, the court appointed Dr. Ritter and Dr. Gene L. Usdin to re-examine Glover, and based on their *126 written report of August 27, 1973, recommitted him to the mental institution on August 29, 1973.
In 1974, Drs. Ritter and Usdin were again appointed to examine Glover. On the basis of their reports of September 26 and 30, 1974, which indicated that Glover was synthetically sane because he was regularly receiving strong anti-psychotic drugs, the court found that Glover was presently competent to understand the proceedings and to assist in his defense.
On March 12, 1975, on motion of defense counsel, the court appointed Drs. Ritter and Usdin to determine the sanity of defendant at the time of the crime. Their report of April 9, 1975, in pertinent part, related:
"There can be no question that Richard Glover has a severe chronic mental illness, namely, undifferentiated chronic schizophrenia; this illness appears to be in remission at the present time. He also has a borderline degree of mental retardation with some organic brain changes which may be secondary to chronic drug abuse. As we mentioned in our earlier report to your Court of September 30, 1974, he requires potent antipsychotic medication, and it is imperative that this medication be continued. We believe he would decompensate without these medications, and we also recognize that his hold to reality is tenuous.
"* * *
"With this type of chronically ill, borderline intelligence person with possible organic brain change, it is difficult to ascertain his mental status at a specific date and time nearly three and a half years ago. He might have been in a period of remission on that date, but were he not being actively treated and receiving antipsychotic medications, it is our opinion that he probably was overtly psychotic and unable to appreciate the usual, natural and probable consequences of his acts, and unable to distinguish the difference between right and wrong of the specific act for which he is charged. However, for the purpose of emphasis, we repeat our lack of certainty about this. Possibly material brought out at the time of the trial by other witnesses may be helpful to the jury.

"* * *."
Counsel for the accused, on May 6, 1975, moved to suppress all statements, both oral and written, made by Glover on June 13 and 14, 1972. After an evidentiary hearing on May 30, 1975, the trial judge, on August 22, 1975, held that the confessions and demonstrations given by Glover to the police on June 13 and 14, 1972 were inadmissible, but overruled the motion to suppress as to Glover's pre-arrest statement to his former common-law wife.
We granted writs applied for by both the State and the defendant to determine the correctness of the trial court's rulings. On original hearing we reversed the suppression of defendant's two statements given while in police custody and affirmed the trial judge's refusal to suppress the oral statement electronically intercepted by police during defendant's conversation with his former common-law wife. We held that before inculpatory statements by a defendant, whether or not made in police custody, may be introduced in evidence, the State must prove they were free and voluntary. However, we concluded that because the State may rely upon the presumption that defendant was sane, it was therefore incumbent on the defendant to prove by a preponderance of the evidence that he was insane at the time of the utterances. Upon reviewing the evidence we determined that the trial judge erred in finding that defendant had borne the burden of proving that he was insane at the time he gave the confession and inculpatory statements. Furthermore, we decided that the defendant had knowingly and intelligently waived his Miranda rights before making the incustody statements, and that the interception of defendant's pre-custody statement to *127 his former common-law wife violated neither the Fourth Amendment nor 18 U.S.C. § 2510, et seq., because she had consented to the electronic eavesdropping.
A rehearing was granted principally to consider defendant's contention that in reversing the trial judge's determination of defendant's insanity at the time he made the statements, we did not accord appropriate weight to these findings of fact. For the reasons set forth below, we now decide we committed factual error by reversing the findings of the trial judge on the issue of insanity. Also, by stating, without more, that a defendant must prove his "insanity" by a preponderance of the evidence as a prerequisite to defeating the State's showing of voluntariness, our original opinion was perhaps misleading. We now recognize that both the trial judge and this Court on original hearing misapprehended the ultimate issue as being whether the defendant was "sane" at the time of his utterances, rather than whether the statements were voluntarily made. Applying the correct principles of law to the evidence we have concluded that the State failed to prove that any of the statements made by the defendant were free and voluntary. Accordingly, we affirm in part and reverse in part the trial judge's rulings, and we pretermit as unnecessary any comment on the other issues discussed in our original opinion.
In our first opinion we correctly held that before either a custodial or a noncustodial confession or inculpatory statement may be introduced in evidence, the State must prove that it was made freely and voluntarily. For convenience we repeat:
"Before a confession or inculpatory statement can be introduced in evidence, it must be affirmatively shown by the state that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451. See also La. Const. art. 1, § 11 (1921), in effect at the time of the alleged offense;
La.Code Crim.P. art. 703(C) (1966). The admissibility of a confession or an inculpatory statement is a question of law for the trial judge to determine; the weight to be given it is a question for the jury. State v. Sears, 298 So.2d 814 (La. 1974); State v. Simpson, 247 La. 883, 175 So.2d 255 (1965); State v. Kennedy, 232 La. 755, 95 So.2d 301 (1957). Therefore, only after the trial judge has decided that the state has satisfied its burden of proving that a confession or inculpatory statement was free and voluntary may it be introduced in evidence. [Footnote 2: "The due process clause of the fourteenth amendment also requires that the court determine that a confession is free and voluntary before it allows its admission in evidence. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)."]
"The trial judge felt that defendant's inculpatory statement to his common-law wife, because it was precustodial, was not subject to the requirement that it be found free and voluntary under the standards set forth above before its admission in evidence. In this respect, we believe he erred. The provisions of Louisiana law establishing that only free and voluntary confessions and inculpatory statements are admissible draw no distinction between those made before and after the accused is taken into police custody. La. Const. art. 1, § 11 (1921); La.R.S. 15:451; La.Code Crim.P. art. 703(C) (1966). We have defined an `inculpatory statement' as one that refers to the out-of-court admission of incriminating facts made by the accused after the crime has been committed. It relates to past events. State v. Fink, 255 La. 385, 231 So.2d 360 (1970). Defendant's inculpatory statement to his common-law wife, made almost six months after the crime with which he is charged occurred, incontestably falls within this definition. The state is not required, it is true, to show when it seeks to introduce a noncustodial inculpatory statement in evidence *128 that the accused had been advised of his Miranda rights before it was made. State v. Roach, 322 So.2d 222 (La.1975). It still has the duty, however, of affirmatively showing that a noncustodial confession or inculpatory statement is free and voluntary. Therefore, the trial judge erred in ruling that it was unnecessary for the prosecution to lay this foundation and for him to rule thereon prior to the introduction of defendant's inculpatory statement to his common-law wife in evidence." (Footnote 3 omitted.)
We note that some jurisdictions have adopted the contrary view that a confession may be involuntary in the due process sense only where the declarant has been subjected to police custody, external pressure or coercion. United States v. Bernett, 161 U.S.App.D.C. 363, 495 F.2d 943 (1974); People v. Brown, 86 Misc.2d 339, 380 N.Y.S.2d 476 (1975) (and cases cited therein). However, we reject this view as incorrect and destructive of the very purposes of requiring the prosecution to demonstrate that a confession was voluntarily made before it can be introduced in evidence. The position we have taken has been adopted by other courts in Eisen v. Picard, 452 F.2d 860 (1st Cir. 1971); United States v. Robinson, 148 U.S.App. D.C. 140, 459 F.2d 1164 (1972); Gladden v. Unsworth, 396 F.2d 373 (9th Cir. 1968). Cf. Pea v. United States, 130 U.S.App.D.C. 66, 397 F.2d 627 (1967).
On the other hand, some elaboration upon other statements of law in our original opinion is required. Although we acknowledged that the State bears the burden of proving that a confession or inculpatory statement is free and voluntary, La.R.S. 15:451; La.C.Cr.P. art. 703(C), we neglected to say that the prosecution is required to prove this beyond a reasonable doubt. State v. Ragsdale, 249 La. 420, 187 So.2d 427 (1966). The United States Supreme Court has held that the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary, but that the states are free to adopt a higher standard. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Also, a false impression may have been created by our statement that La.R.S. 15:432, which presumes "that the defendant is sane and responsible for his actions" places upon the accused the burden of proving by a preponderance of the evidence his "insanity" at the time of a confession. Although the defendant bears the burden of proving the existence of a mental abnormality which, under the circumstances may have destroyed the voluntary nature of his confession, he is not required to prove a particular kind of "insanity." The legislature has not defined insanity for this purpose as it has with regard to insanity at the time of an offense, La.R.S. 14:14, and mental capacity to proceed, La.C.Cr.P. art. 641. Also, we should have added that a claim of mental illness or introduction of evidence thereof does not shift the ultimate burden of proof of voluntariness from the State. If the defendant fails to prove the existence of a mental illness or defect or fails to prove that such a disorder prevented his confession from being voluntary, the State is not required to negate the defendant's mental abnormality, but the State must in all other respects prove beyond a reasonable doubt that the confession was voluntary.
Therefore, the crucial issue is not simply whether the defendant was "insane," but whether he suffered from a mental illness or defect which, under the circumstances, prevented his statements from being voluntary. Our having reached this conclusion, however, only makes the case more complicated. Voluntariness is a difficult concept or combination of concepts which do not admit to short or simple description. The courts have branded confessions "involuntary," and therefore inadmissible, for many different reasons. Consequently, there is no easy formula which a trial judge may apply in determining if a confession is voluntary. He must review each and every circumstance leading up to and *129 under which the confession was given and decide if there exists any of the various reasons for suppressing confessions which have developed under the notion of voluntariness.
Justice Frankfurter, in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), stated:
"* * * The notion of `voluntariness' is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes." At 604-605, 81 S.Ct. at 1880, 6 L.Ed.2d at 1059.
In Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), the high court candidly stated that
"* * * [A] complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case." At 207, 80 S.Ct. at 280, 4 L.Ed.2d at 248.
Many legal scholars have attempted to analyze the "complex of values" which provide the reasons that some confessions are declared involuntary and inadmissible. In their very exhaustive discussion of the subject, the authors of Developments in the Law of Confessions, 79 Harv.L.Rev. 938, 963-64 (1966) stated:
"Mr. Justice Frankfurter noted that `"voluntariness" is . . . an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes.' But without a clear understanding of the applicable `legal purposes' as a guide, the fact of voluntariness is extremely difficult to find, since it represents not an observable physical phenomenon but a characterization of varying concatenations of facts. The purposes that dictate a requirement of voluntariness must determine when that requirement is satisfied. The Court's cases suggest that the due process voluntariness standard has three possible goals: (1) ensuring that convictions are based on reliable evidence; (2) deterring improper police conduct; or (3) assuring that a defendant's confession is the product of his free and rational choice. The sections immediately following attempt to assess the extent to which the Court's decisions are consistent with these goals."
In Comment, The Coerced Confession Cases in Search of a Rationale, 31 U.Chi. L.Rev. 313, 325 (1964), the writer attempted to distill all elements of the confession cases:
"The rationale here urged as the one which best accounts for all the elements of the coerced confession cases may be summarized as follows. The accusatorial, adversary trial is the most effective means of accomplishing the goals of the system. When a confession is admitted into evidence it has such a persuasive effect upon the trier of fact as to substantially determine the outcome of the trial. As a result the outcome of the trial is substantially predetermined at the time the confession is obtained. If the adversary theory is not maintained at that time, its benefits are lost to the defendant and to the system. Therefore the adversary theory should govern the proceeding at which the confession is obtained and no confession obtained under circumstances not [sic] incompatible with an accusatorial, adversary system should be admitted into evidence."
In a similar vein, Professor McCormick has described the "complex of values" as follows:
"(1) Protection of particular defendants against use of unreliable confessions. In part, the voluntariness requirement still reflects the concern of the common law rule that a confession obtained in the absence of free choice is unreliable and therefore unworthy of consideration *130 on the issue of guilt or innocence. * * *
"(2) The privilege against compulsory self-incrimination and the values underlying this rule. While in theory police investigators probably have no legally enforceable right to require answers to questions, police interrogation might well convey the impression to a subject that his interrogators had the right or at least the power to compel responses. As a practical matter, then, the values underlying the privilege are endangered by pretrial interrogation. It is clear that this concern was a factor in the promulgation and development of the due process voluntariness requirement. * * *
"(3) Discouragement of police practices that are generally likely to result in unreliable evidence. In addition to the unreliability of particular confessions challenged under the voluntariness requirement, the rule is in part based upon the assumption that as a general matter there is sufficient probability that an involuntary confession will be unreliable that the exclusion of the entire category is justified. Thus the rule serves the purpose of excluding a category of evidence which, as a whole, is sufficiently subject to question on reliability grounds to justify its exclusion.
"(4) Discouragement of police practices which are unacceptable on grounds other than the unrealiability of the resulting evidence. Analogous to the policy basis of the privilege against self-incrimination, there is undoubtedly a feeling underlying the voluntariness requirement that the methods used to obtain nonvoluntary confessions are unacceptable without regard to the reliability of the resulting evidence. Here, as in the case of that privilege, the conclusion rests in large part upon acceptance of the propositions that even one guilty of an offense against society has a right to be treated in a manner consistent with his inherent dignity as a human being, and that the use of certain investigating tactics is inconsistent with this dignity.
"(5) The preservation of the trial rights of an accused. Because of the heavy weight which a trier of fact is likely to give to a statement of the defendant, the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained. Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof. Yet the imposition of this burden of proof upon the prosecution serves valuable social purposes, not only in assuring the guilt of particular defendants but also in minimizing the availability of the criminal process for political and other irregular purposes. The social interest in making the trial a truly adversary proceeding at which the state prove guilt beyond a reasonable doubt is served by a policy which minimizes the opportunity for the state to bypass this requirement by use of a statement obtained during pretrial investigation." McCormick on Evidence, § 148, at 315-316 (2d ed. 1972). (Footnotes omitted.)
See, generally, 3 Wigmore on Evidence, § 822 (Chadbourn Rev. 1970).
In Blackburn v. Alabama, supra, where the Court set aside a conviction based on the confession of a madman who had been institutionalized during the four years immediately prior to the crime and the interrogation, Chief Justice Warren acknowledged the validity of the elements which have been pointed out by the scholars as justification for suppression of a confession. The opinion stated:
"In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of *131 our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion. * * *." (Emphasis supplied.) 361 U.S. at 207, 80 S.Ct. at 280, 4 L.Ed. 2d at 248-249.
We have reviewed the evidence in the instant case with the various tests of voluntariness in mind. There appears to be no evidence of improper police practices.[*] We have some doubt as to whether the statements were obtained under circumstances compatible with an accusational, adversary system, because the evidence is fairly conclusive that Glover lacked the mental capacity to proceed at the time he made the confession and inculpatory statements. Under the theory that the real trial, for all practical purposes, occurs when the confession is obtained and, therefore, should take place under conditions compatible with a court proceeding, Glover's statements would clearly be inadmissible. However, because it is a newly emerging and, at present, ill defined theory, we prefer to rest our decision herein upon more traditional grounds. Therefore, we will discuss only two questions raised by the medical evidence as to Glover's statements: Do the statements constitute trustworthy and reliable evidence? And were they products of Glover's free and rational choice ?
Although in recent times the United States Supreme Court has paid greater attention to other aspects of the voluntariness requirement, we have no doubt that the probable testimonial trustworthiness of a confession still is and ought to be established as a necessary antecedent to its introduction in evidence. The Court in Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), stated:
"A coerced confession is offensive to basic standards of justice, not because the victim has a legal grievance against the police, but because declarations procured by torture are not premises from which a civilized forum will infer guilt."
And in Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948, 958 (1961), Justice Douglas concurring said: "Experience however teaches that confessions born of long detention under conditions of stress, confusion, and anxiety are extremely unreliable." Thus if confessions obtained by coercive methods are inadmissible because they are apt to be unreliable, then confessions which are proven to be untrustworthy, for whatever purpose, should not be introduced in evidence.
One classical articulation of the requirement that a confession must be the product of a free and rational choice is set forth in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), as follows:
"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing *132 self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." 367 U.S. 602, 81 S.Ct. 1879, 6 L.Ed.2d 1057-1058.
At the motion to suppress hearing in the instant case, the defendant called as his only witness, Dr. Ritter, the psychiatrist whom the court had previously appointed to examine him on several occasions. The State called no psychiatric or psychological experts, but relied on the testimony of four police officers, an assistant district attorney and a stenographer, who either interrogated the defendant or observed him during the time he was questioned and confessed.
Dr. Ritter first examined the defendant on September 14, 1972, three months after Glover made the statements in question. The doctor testified that in his opinion the defendant at that time was actively psychotic to such a degree that he was "legally insane." When asked to define this term he testified that Glover
"* * * [W]as unable to appreciate the usual, natural, and probable consequences of his acts. And unable to tell the difference between right and wrong. . . and unable to assist counsel."
Dr. Ritter, with Dr. Usdin, again examined Glover for the purpose of determining his mental state on December 24, 1971, the date of the offense. Their report of that examination which was introduced at the hearing, in part, related:
"A. With this type of chronically ill, border-line intelligence person with possible organic brain change, it is difficult to ascertain his mental status at a specific date in time nearly three-and-a-half years ago. He might have been in a period of remission on that date, but were he not being actively treated and receiving anti-psychotic medication, it is our opinion that he probably was overtly psychotic and unable to appreciate the usual, natural and probable consequences of his acts, and unable to distinguish the difference between right and wrong of the specific act for the purpose of emphasis, we repeat our lack of certainty about this."
When asked to give his opinion of Glover's mental condition of June 13 and 14, 1972, assuming he had no medication, Dr. Ritter replied:
"Oh, I must assume that because of the fact that schizophrenia is a chronic disease, and that it rarely appears suddenly and without warning, that it generally appears much earlier in life in adolesence [sic], and that we did discover that the man had schizophrenia, and that he showed the sign of schizophrenia on the date in September. I must assume he was schizophrenic in June. It was not what you would call a fresh case of schizophrenia. He showed marked luny [lunacy], of that effect, and vast signs of schizophrenia, and also mental retardation. And I must assume as of June that he was, in all likelihood, in the same state when I saw him in September."
He later elaborated on this subject, stating:
"A. We can certainly assume considering the far-advanced nature of the diseased process, that it was in existence in June and didn't [first] appear in the interval between June and September. Just like if you see a far-advanced case of arthritis with deformity of the hand and back and feet, you know that that arthritis didn't start yesterday or three months ago. You know it's been going on for a number of years at least."
The record does not reflect that Glover was taking any medication that would prevent him from being psychotic on June 13 and 14, 1972. In order to transform Glover's mental state to a condition of synthetic sanity it had been necessary to administer heavy doses of powerful antipsychotic *133 drugs. The record does not reflect how long the transformation had required, but Dr. Ritter described the administration of the drugs as follows:
"He is on prolixin, intra-muscularly, two cc's every three weeks. Now, prolixin is a very potent anti-psychotic medication, and this is administered by a needle. He is on thorazine, 200 milligrams at bedtime. Again, not a potent it's a potent medication, not excessively high dose. I would say an average dose, but prolixin is a potent drug."
Dr. Ritter testified that on one occasion through oversight the medicine had not been given for a short period of time and that Glover consequently regressed very rapidly into a state of overt psychosis.
Therefore, Dr. Ritter testified again that, in his opinion, without this potent medicine, Glover would have been insane on June 13 and 14, 1972.
On cross-examination, Dr. Ritter testified that if Glover spoke with several officers on June 13, 1972 and responded logically and coherently to their questions this would not cause him to change his evaluation of Glover's psychosis at that time. The doctor stated,
"* * * I would have to know a great deal of what was talked about, what level was going on, a great deal more information. I can converse with Richard, and have on a number of occasions where he was able to respond appropriately to some questions. * * *"
Dr. Ritter was shown the two typewritten statements taken from Glover and asked if the fact that he blamed a second party for the offense in one of the statements would cause him to alter his evaluation. The doctor replied,
"* * * Having read these two, things and making an assumption that the man was actively psychotic at the time these two statements were rendered, I would not know which one to believe knowing that the man was schizophrenic. Because any definition, in any definition of schizophrenia, there's always the substitution of fantasy for reality, and this is the difficulty in testing credibility to either one. * * *"
Further elaborating on this issue the doctor testified:
"Q. You indicated in answer to Mr. Whalen's questions that in your dealing with individuals with a similar kind of mental problem as Mr. Glover, that because of the fantasy world or what have you, you would have trouble believing any particular statement that any of them made, is that right?
"A. I would have difficulty in making a decision insofar as these two statements are concerned. Difficulty in making a decision, which one was valid, which one reported fact.
"Q. Or either of them?
"A. Either of them.
"Q. So that in your mind there is a significant question as to the truthfulness or reliability in terms of truthfulness in those confessions?
"A. Yes, sir, that would be my opinion."
Finally, Dr. Ritter was questioned about the combined effect of Glover's psychosis and his mental retardation:
"Q. Now earlier, we spoke about the effect of retardation, mental retardation on an individual, specifically. If you combine, as in Mr. Glover's case, retardation with the organicity and the psychosis that you saw and applied was in force on June 14th and 13th, 1972, would you say that Mr. Glover was in a position to make rational decisions? That is not isolating the retardation, now, but putting it all together ?
"A. I would think that his decisions were heavily biased by his psychosis and *134 mental retardation, without question. And from the standpoint of rationality, I would think that it would be and do with a good deal less rationality that if I or someone else were doing the same thing."
The State's attorney was able to elicit from Dr. Ritter statements to the effect that it was within the realm of possibilities that Glover was not as psychotic on June 13 and 14, 1972 as he was at the time the doctor first examined him on September 14, 1972; and that it was possible that he was in a state of remission at the time of the confession. In our original opinion we seized upon these statements to overturn the trial court's factual finding of insanity at the time of the confession and inculpatory statements.
In doing so we erred. To paraphrase the United States Supreme Court in Blackburn v. Alabama, supra, it is, of course, quite true that we are dealing here with probabilities. It is possible that Glover confessed during a period of complete mental competence. But a fair reading of the entire record leads only to the probable conclusions that Glover, who was twenty-six at the time of the offense, suffered from undifferentiated schizophrenia and mental retardation from his adolescence; that he was actively psychotic and legally insane at the time of his confession and inculpatory statements; and that due to the nature of his illness, which causes the subject to substitute fantasies for reality, all of Glover's statements on June 13 and 14, 1972 were testimonially untrustworthy and not products of his free and rational choice. Although facts pertaining to the imbalance of a human mind cannot easily be ascertained since it requires a judgment which must by its nature always be one of probabilities, once the probabilities have been determined we must unflinchingly decide the case in accordance with them.
The trial judge found Glover's in-custody statements to have been involuntary because of his mental condition. As we understand his reasons for judgment he refused to suppress Glover's statement to his former common-law wife solely because it was a non-custodial statement, and not because Glover was any less insane at this time. The record does not contain any evidence which would indicate a difference in Glover's mental condition at the time of each of the three statements at issue here. We have already stated our reasons for concluding that the trial judge committed an error of law in excluding the non-custodial statement from the voluntariness requirement. We conclude that the law and the evidence support a finding that Glover suffered from insanity and mental defects on June 13 and 14, 1972 which caused all of the statements given by him on those dates to have been involuntary and, consequently, inadmissible.

Decree
For the reasons assigned, we affirm the ruling of the trial judge suppressing the oral and written confessions and demonstrations made on June 13 and 14, 1972, but we reverse his ruling that the oral inculpatory statement made by defendant to his former common-law wife on June 13, 1972 is admissible and order that it be suppressed also.
The case is remanded for further proceedings, including a trial on the merits, not inconsistent with this opinion.
SANDERS, C.J., dissents, adhering to the majority views expressed on original hearing.
SUMMERS, J., dissents, being of the opinion the original opinion is correct.
MARCUS, J., dissents, adhering to reasons and decree in original hearing.
NOTES
[*] Sanders, C.J., Summers and Marcus, JJ., were of the opinion that a rehearing should be granted.
[1] Defendant had been found incapable of standing trial because of his insanity; however, on March 11, 1975, after a hearing, the court ruled that defendant was presently sane and able to stand trial.
[2] The due process clause of the fourteenth amendment also requires that the court determine that a confession is free and voluntary before it allows its admission in evidence. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).
[3] Cf. State v. LeBlanc, 305 So.2d 416 (La. 1974) and State v. Bendo, 281 So.2d 106 (La. 1973), wherein we held that the accused is entitled to notice in accordance with article 768 of the Code of Criminal Procedure and to pre-trial inspection of recorded post-crime inculpatory statements made prior to arrest.
[4] This article places upon the defendant the burden of establishing insanity at the time of the offense by a preponderance of the evidence. We have also held that owing to the presumption of sanity the accused has the burden of proving by a preponderance of the evidence that he is incapable of standing trial because he is mentally defective. State v. Gray, 258 La. 852, 248 So.2d 313 (1971); State v. Graves, 247 La. 683, 174 So.2d 118 (1965).
[5] Defendant argues that Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) is controlling here. We do not agree. The facts in Blackburn, in which the confession of an insane person was suppressed, are clearly distinguishable from those in the instant case. The accused in Blackburn was a patient at a mental institution who committed a robbery while on an authorized absence from the hospital ward. At the time he committed the crime, he had a lengthy history of mental illness and had already been declared "100 per cent incompetent." Moreover, the accused in Blackburn was subjected to a sustained, eight-to-nine-hour interrogation in a tiny room without the presence of any of his friends and relatives before the police procured a confession. The Supreme Court, in Blackburn, held that the admission of the accused's confession, obtained under the circumstances of that case, violated the due process clause of the fourteenth amendment.
[6] "Oral communication" is defined in 18 U.S. C. § 2510(2) as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectations." Glover's conversation with Linda Bently would fall within this definition.
[*] We do not reach in this opinion the issues of whether Glover knowingly and intelligently waived his Miranda rights or whether the electronic eavesdropping constituted a violation of the Fourth Amendment or 18 U.S.C. § 2510, et seq.