519 So.2d 87 (1988)
STATE of Louisiana
v.
Ronald MARTIN, Sr.
No. 87-K-1485.
Supreme Court of Louisiana.
January 18, 1988.
Clifford E. Foster, New Orleans, Paul E. Brown, Office of Indigent Defender, Thibodaux, for applicant.
William J. Guste, Jr., Atty. Gen., Douglas Greenburg, Dist. Atty., for respondent.
CALOGERO, Justice.
Defendant Ronald Martin, Sr. was charged with aggravated rape, aggravated crime against nature and aggravated burglary. At his trial, there was no true dispute over the fact that the victim had been raped. Instead, the primary issue was whether the defendant was the rapist. The victim testified that the man who attacked her had a tattoo on his right upper arm which "said something like `Angela,'" and "had some loops in it." In response to this testimony, the defendant asked to be permitted to display his arms to the jury, for the apparent purpose of demonstrating that he did not have a tattoo which matched the victim's description, but that he did have noticeable tattoos on his arms of a type that had not been observed by the victim on her assailant.
The trial judge ruled that the defendant could display his arms to the jury, but that if he did so, the state would be permitted to cross-examine him on the origin of any tattoos which were on his arms, and on whether he had ever had any tattoos removed. Rather than exposing the defendant to cross examination in this fashion, defense counsel opted not to have his client display his arms to the jury. The jury later found the defendant guilty on all three counts, and his convictions were affirmed by the court of appeal. Because we find that the trial court committed prejudicial error by ruling that the defendant could not display his arms to the jury without submitting himself to cross-examination, we now reverse the conviction and remand for re-trial.

*88 (I) FACTS
The court of appeal decision ably summarizes the pertinent facts which precipitated the defendant's indictment, and we repeat that court's factual summary here:
"During the evening of December 16, 1983, an eighteen year old woman was brutally raped and subjected to other intimate indignities. The victim testified that she was home alone at her parents' house in Schriever when an intruder entered her bedroom. The man held a knife to the victim's throat and threatened to kill her if she failed to cooperate. After looking around the house for money and other valuables, the man made the victim submit to vaginal and oral intercourse. Immediately after the man left, the victim called her mother at work. Her parents then summoned the police. The victim gave a detailed description of her assailant to the police and noted that the man was present in her home for about one hour. A few days after the incident, Terrebonne Parish Detective Godfrey Buquet produced a composite drawing of the suspect during the course of an interview with the victim. Although the victim examined several mugshot books, she did not identify her assailant until August of 1984. At that time, Terrebonne Parish Sheriff's Deputy Robert Breaux was investigating several unsolved burglaries. During the course of that investigation, he interviewed defendant, who was then incarcerated in the Lafourche Parish Detention Center for an armed robbery violation. Detective Breaux, who was familiar with the instant case, testified that he noticed the similarity between defendant and the composite drawing. Thereafter, he prepared a photo array, which was exhibited to the victim. She immediately identified defendant as the perpetrator of these offenses." State v. Martin, 509 So.2d 160, 163 (La.App. 1st Cir.1987).

(II) TRIAL
Following the victim's identification of the defendant, he was indicted for aggravated rape, aggravated crime against nature and aggravated burglary. He entered a plea of not guilty to each charge, and the case proceeded to trial before a jury.
At the trial, defendant did not contest the fact that the victim had been assaulted and raped on the night in question. Medical testimony corroborated the victim's claim that she had been raped, and defense counsel conceded as much in closing argument. Rather, the defense contended that Martin was not the rapist. Thus the crucial issue in the trial became whether the State had proven beyond a reasonable doubt that the defendant was the culprit.
During the presentation of the state's evidence, the victim took the stand and identified the defendant as the man who had raped her. The jury also heard testimony from investigating police officers, who recounted the description of the assailant which they had received from the victim immediately after the crime, the manner in which the composite drawing was prepared and the fact that the victim had identified the defendant from a photographic line-up some eight months after the assault.
When asked by the prosecutor if she noticed anything peculiar about the physical appearance of the man who raped her, the victim described the clothes that the man had been wearing and the color of his hair. She added that:
He had ahis flannel shirt was rolled upthe sleeves on it were. He had on heavy gloves and he had a tattoo across his arm.
Q. Do you remember what the tattoo said?
A. I'm not sure.
Q. Do you rememberWhat did you tell the police it said?
A. It said something like "Angela" you knowI remember it had some loops in it.
Under cross-examination by defense counsel, the victim stated that the tattoo she had observed was located on the assailant's upper right arm, in the biceps area. She further testified that although the rapist did not remove his shirt during the attack, the tattoo on his right upper arm was visible because the sleeves on his flannel *89 shirt were rolled up. She also stated that she did not observe any other tattoos on the defendant's body.
After the state rested its case, the defense presented testimony from a number of defendant's friends and family members, primarily for the purpose of attempting to establish an alibi defense. Some of these witnesses were also asked by defense counsel if they had ever observed any tattoos on the defendant's body.
Defendant's wife testified that Martin had a number of tattoos on his body for the entire six year period that she has known him. However, she denied that he had any tattoo which read "Angel" or "Angela," or that contained any similar word. Linda Rison, an acquaintance of the defendant, testified that Martin had "a lot of tattoos," and that those tattoos had been on his body for the entire seventeen year period that she had known him. She was not asked to describe the tattoos.
Finally, defendant's mother testified that her son "has several tattoos," and that to the best of her knowledge all of the tattoos on his body were at least ten years old at the time of trial. She further testified that her son had never had a tattoo removed. When asked on cross-examination to describe the tattoos, she testified that Martin has tattoos which read "Darlene," "Love and Hate," and "Devil's Disciple." She stated that one of the tattoos was on the fingers of Martin's hand, and that she was unsure of the exact location of the others: "Some of `em are on his body and some are on his legs."
After the testimony of these and other defense witnesses was concluded, defense counsel requested of the court "that Mr. Martin be able to stand before the jury and show the tattoos he has on his arms." The prosecutor immediately interjected and requested the right to "cross-examine" the defendant "relative to the tattoos" if such a display were allowed. Defense counsel responded that the defendant's act of showing his arms to the jury would not constitute testimony, and that therefore the state should gain no right to question him on any issue.
The trial judge disagreed, and ruled that while the defendant could display his arms to the jury, he would be subjected to "limited" cross-examination by the state if he chose to do so. The scope of the cross-examination would include the questions of "when and where" defendant obtained the tattoos and "who put them there."
Defense counsel objected to the trial court's ruling, arguing that such a "limited" cross-examination would force the defendant to reveal that he obtained some of his tattoos while he was in jail for unrelated charges, and that disclosure of the fact that defendant had been imprisoned for other offenses would unfairly prejudice him in the eyes of the jury. The trial judge overruled the defense objection, and defense counsel accordingly opted, in light of that ruling, to have his client forego displaying his arms to the jury. Thereafter, the defense rested, and the case was submitted to the jury. After deliberating for over three hours, the jury returned a guilty verdict for each of the offenses charged.

(III) DISPOSITION BY THE COURT OF APPEAL
Defendant timely appealed his convictions and urged eleven assignments of error to the First Circuit Court of Appeal. In assignment of error number seven, defendant contended that the trial court erred by not allowing him to display his tattoos to the jury without being subjected to limited cross-examination.
The court of appeal found that while it is "well settled" that an identifying tattoo on a defendant's body is "demonstrative rather than testimonial evidence," such evidence is only admissible when it is material. Noting that the trial judge is vested with wide discretion in determining whether evidence is relevant, the appellate court concluded that the court's ruling on the tattoo issue was not an abuse of discretion: "Because body tatoos [sic] are subject to alteration, the trial court properly limited their display absent some foundation as to origin." State v. Martin, 509 So.2d 160, 166 (La.App. 1st Cir.1987).
*90 The court of appeal also found no merit in defendant's remaining ten assignments of error, and defendant's convictions were accordingly affirmed. Defendant then sought a writ from this Court, in which he urged the same eleven assignments of error. We granted the writ, 512 So.2d 446 (La.1987), and commented that "Briefing and argument are especially requested on Assignment No. 7," i.e., the tattoo demonstration issue.

(IV) ANALYSIS
As indicated by the language which accompanied our writ grant, the issue which prompted our review of this case is whether the defendant could be forced to submit to cross-examination as a condition of his right to display his arms to the jury. We have nevertheless reviewed the other assignments of error urged by the defendant (Assignments 1 through 6 and 8 through 11) and have concluded, for the reasons stated by the court of appeal, that none of them have merit. Therefore, our discussion herein shall be confined to the issue raised by assignment of error number seven.
The Fifth Amendment's privilege against self-incrimination prevents an accused from being compelled to testify against himself. From time to time, courts have been asked to consider whether the demonstration of certain physical or bodily characteristics of the defendant to the trier of fact constitutes "testimony" for Fifth Amendment purposes. The importance of that determination cannot be overstated: if the exhibition of a physical characteristic of the accused were to be considered testimony, then the state would be prohibited by the Fifth Amendment from compelling such a demonstration. Further, any voluntary introduction of such "testimony" by the defendant would arguably constitute a waiver of his right not to testify against himself, and that would expose him to cross-examination by the prosecution.
On the other hand, if such a physical display is not to be construed as testimony, but is instead viewed simply as the introduction of demonstrative evidence, Fifth Amendment considerations are not triggered. The state can accordingly compel the defendant to display a physical characteristic or trait without violating the defendant's privilege against self-incrimination, and the defendant may voluntarily offer such a display without subjecting himself to cross-examination.
The United States Supreme Court has clearly reached the latter conclusion, and has repeatedly found that no Fifth Amendment violation occurs when the state compels the defendant to display certain identifiable physical characteristics. In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that the admission into evidence of an analysis of the defendant's blood did not violate the Fifth Amendment. In so holding, the Court differentiated between an accused's communications, which are protected by the privilege against self-incrimination, and the accused's physical characteristics, which are not protected by the privilege and which may be offered to the trier of fact as physical evidence. Thus, the Court concluded that admission of the blood analysis results did not violate the privilege, just as the Fifth Amendment is not violated when the defendant is compelled to "submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture."
Schmerber's rationale has been followed in a number of United States Supreme Court cases, each of which rejected the contention by the accused that the physical demonstration at issue infringed upon his privilege against self-incrimination. See United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (defendant compelled to provide voice exemplar); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (defendant compelled to provide handwriting sample); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (defendant charged with bank robbery required to utter words used by robber).
*91 Similarly, this Court has held on numerous occasions that the state may compel the defendant to display a physical characteristic to the jury, and that such display does not violate the Fifth Amendment because it does not constitute testimony. Most pertinent to this case, we have held that the state may compel a defendant to exhibit before the jury tattoos on his person. State v. Wilson, 329 So.2d 680 (La. 1976). We have also held that the defendant may be compelled to exhibit a scar, State v. Anthony, 332 So.2d 214 (La. 1976), and a bruise, State v. Washington, 294 So.2d 794 (La.1974).
In light of this well established jurisprudence, the state unquestionably would have had the right to compel Martin to display his arms to the jury, had it desired such a display. Any protest by Martin that such a display would force him to testify against himself and violate his privilege against self-incrimination would have been crushed by the weight of firmly rooted federal and state precedent. The question thus becomes whether the rule, that a defendant's display of a physical characteristic is not testimony, should be any different when it is the defendant, rather than the state, who desires to make the physical demonstration. Considerations of due process and reciprocity require us to answer that question in the negative.
In fact, we have already addressed a very similar issue, albeit in a case that did not involve tattoos. Our holding in State v. Tillett, 351 So.2d 1153 (La.1977), should control here. In Tillett, the victim of an armed robbery testified that the robber (whom he identified as the defendant) spoke with a Spanish accent. In response to this testimony, the defendant requested the right to read a passage of the court's choosing to the jury, so as to demonstrate that he did not have a Spanish accent. The trial court held that if the defendant gave such a voice demonstration, he would waive his Fifth Amendment privilege and be subject to cross-examination. The defendant then opted not to give a voice demonstration, and he was later convicted.
On appeal, we found that the trial court's ruling on the voice demonstration request constituted reversible error. We first cited numerous state and federal authorities for the proposition that the state could have compelled the defendant to read to the jury for the purpose of revealing whether he had a Spanish accent, had it desired such a demonstration. Forcing the defendant to speak in the presence of the jury "would simply have made one of his physical characteristics the subject of evidence, and as such would not have been protected by his rights against self-incrimination." 351 So. 2d at 1156.
Because the state could have compelled the defendant to reveal the character or quality of his voice without infringing upon his Fifth Amendment rights, we concluded that "his offering to make such a demonstration could not have constituted a waiver of his privilege against self-incrimination." Id. We noted that the privilege is only waived when the defendant voluntarily testifies on his own behalf. Once the privilege is so waived, the defendant is subject to cross-examination. However, since the defendant's display of his voice was not testimonial in nature, there was no waiver of the privilege, and there could be no cross-examination.
We concluded our analysis of this issue in Tillett by indicating that our holding was tied to constitutional due process considerations:
It has long been held that one of the essential ingredients of due process is reciprocity, see Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), and we hold that if the state can compel a criminal defendant to demonstrate his physical characteristics before the jury without infringing on his fifth amendment rights, a defendant's offer of such a demonstration does not constitute a waiver of that same right.
351 So.2d at 1157.
The trial judge erred in holding that defendant would be subject to "limited" cross-examination if he chose to display his tattoos to the jury. Such a display would not have constituted testimony by the defendant, *92 and thus there would have been no waiver of his privilege against self-incrimination. Without a voluntary waiver of that privilege by the accused, he cannot be subjected to any cross-examination or questioning by the state, "limited" or otherwise. The trial judge's proposal to limit cross-examination to questions involving the tattoos does not remedy the error; the state cannot put the defendant on the stand for the purpose of eliciting any testimony absent a waiver of the privilege, and here a display of the tattoos would not have constituted such a waiver.
Defendant has argued in brief that cross-examination by the prosecutor on the origin of the tattoos would have unfairly prejudiced his case because such questioning would have revealed that he obtained some of his tattoos while he was in jail for unrelated charges. Certainly that possibility raises valid concerns of prejudice to this defendant, and it is an example of one of the problems which would be caused this defendant by allowing the state to conduct a "limited" cross-examination. However, we emphasize that in order to have the right to make a physical demonstration to the jury without being forced to submit to questioning by the state, it is not necessary for the defendant to first demonstrate how his case might be prejudiced if he is subjected to cross-examination. As long as the defendant does not waive the privilege against self-incrimination, it is his to exercise as he sees fit, and he need offer no justification for not desiring to take the witness stand.
The court of appeal correctly noted that a tattoo display by the defendant would constitute demonstrative, rather than testimonial evidence. Nonetheless, it concluded that the trial court was justified in excluding the display absent testimony from the defendant on cross-examination. The appellate court apparently reasoned that the presence or absence of tattoos on the defendant's body at the time of trial was immaterial until or unless there was a proper foundation for that evidence, meaning a showing that no tattoos had been removed from or added to the defendant's arms after the date of the offense.
We certainly agree that any evidence offered by the defendant, whether a writing, a tangible object or a physical characteristic, must be material to the case, and relevant. In this case, however, the tatttoo display was material and relevant, for the following reasons.
To begin with, the state's case against Martin rested almost entirely on the victim's testimony. Any evidence which might tend to discredit or weaken her identification of Martin as the rapist was clearly material. Further, the court of appeal failed to recognize that the proper evidentiary foundation for the physical display was well in place at the time that the defendant sought to make the demonstration. The victim put in issue the question of whether or not the defendant had a certain type of tattoo on his right upper arm when she described her assailant and the type of tattoo that she observed on his arm. She also vested with relevance the question of whether the defendant had any other tattoos on his arms when she testified that she did not recall seeing any tattoos on the attacker other than the one which said "something like Angela."
The victim's testimony alone constituted a sufficient evidentiary foundation to allow the defendant to display his arms to the jury. Certainly had the state desired to have the defendant display his right upper arm to the jury, the victim's testimony would have entitled it to an order requiring such a demonstration, and no further "foundation" would have been required.
However, the victim's testimony formed only a part of the foundation which supported the admission of the tattoo display in this case. As recounted earlier in this opinion, various defense witnesses testified that, to their knowledge, Martin did not have a tattoo which matched or was similar to the one described by the victim, that he had never had a tattoo removed, that he had a number of tattoos on his person and that he had obtained those tattoos years ago. This testimony must be considered as further establishing a relevance foundation for the proposed tattoo display.
*93 It is true, as the state has argued from the moment that the defendant first asked to display his arms to the jury, that tattoos can be altered or removed from a person's body. It is also true that virtually all types of physical evidence are subject to alteration or tampering, and that on occasion a piece of evidence can appear to support a proposition which in reality is false, because that evidence has been changed since the date of the event in question. In any case where the state suspects or has knowledge that the defendant has offered such evidence, it is in a position to call its own witnesses to impeach the evidence, to cross-examine any witnesses whom the defense does call, and to argue to the jury that the evidence is not credible, or perhaps not dispositive. However, the possibility that a particular piece of evidence might conceivably have been altered does not bar its introduction or require the defendant to provide introductory testimony in contravention of his Fifth Amendment privilege.
Finally, we determine that the trial court's ruling constitutes reversible error. As in Tillett, virtually "[t]he entire state case was based upon identification." 351 So.2d at 1157. Because the proposed tattoo evidence was directly relevant to that issue, and could have influenced the jury's assessment of the victim's identification of the defendant, we certainly cannot say that the erroneous exclusion of that evidence was "harmless beyond a reasonable doubt." Cf., State v. Green, 493 So.2d 1178, 1185 (La.1986). Thus, we reverse the defendant's convictions, and remand the case for a new trial.

DECREE
Because we find merit in the defendant's seventh assignment of error, we reverse his convictions and sentences on each of the three charges and remand the case for a new trial.
REVERSED, REMANDED TO THE DISTRICT COURT FOR A NEW TRIAL.