634 So.2d 503 (1994)
STATE of Louisiana
v.
Melvin GREEN.
No. 92-KA-2700.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 1994.
*505 Ginger Berrigan, Gravel, Brady & Berrigan, New Orleans, for Melvin Green.
Harry F. Connick, Dist. Atty., Susan M. Erlanger, Asst. Dist. Atty., New Orleans, for State of Louisiana.
Before BYRNES and JONES, JJ., and JOHN A. DIXON, Jr., J. Pro Tem.
JOHN A. DIXON, Jr., Judge Pro Tem.
On October 10, 1991, defendant, Melvin Green, along with Darrell Claiborne and George McClow, was indicted by a grand jury for the first degree murder of Pamela Beth Block on August 19, 1991.[1] Defendant pleaded not guilty, and, on July 21-23, 1992, he was tried by a twelve-member jury which found him guilty as charged. The jury was unable to reach a decision during the penalty phase. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant appeals his conviction.

STATEMENT OF THE FACTS
On August 29, 1991, at approximately 9:00 p.m., Pamela Beth Block and her husband walked to her car, parked in front of their home in the 4800 block of Carondelet Street. Three black males, riding bicycles, approached them. One of the three men pulled a gun from his waistband and demanded that the Blocks "give it up." Mrs. Block panicked and jumped into her car through the driver's side door. The man with the gun shot through the passenger side window, and the bullet struck Mrs. Block in the neck. The three men rode away. Mrs. Block died of the wound forty-five minutes later.
The police obtained a general description of the suspects from Mr. Block. Pursuant to the description that was broadcast, the police arrested three juveniles, with a fourth juvenile later arrested. The three juveniles were brought to a location on St. Charles Avenue to allow Mr. Block to identify them. Mr. *506 Block did not identify them as the perpetrators, but he did note that one of them had a hairstyle similar to that of the one who shot his wife. One of the juveniles gave a statement to the police in which he named another one of the juveniles as the person who shot Mrs. Block. He later recanted the statement and testified that he gave the statement out of fear.
The next day, an unidentified informant called "Crimestoppers" to tell the police that defendant, Darrell Claiborne, and someone he knew as "Duck" (later identified as George McClow) were the ones who murdered Mrs. Block. Using this information, the police obtained search and arrest warrants. At defendant's home, the police seized, among other things, four photographs in which the defendant was depicted holding a .357 magnum. Defendant was arrested on the evening of August 29 at the home of his girlfriend's mother. At that time, he was advised of his Miranda rights.
At police headquarters, defendant signed a waiver of rights form and was verbally informed of his rights. He gave a tape-recorded statement in which he admitted being at the scene of the crime but said that Claiborne had shot Mrs. Block. After the taping of this statement was completed, the police showed defendant the photographs showing him holding a gun. Defendant admitted that the gun was his, and he led the police to a vacant lot at Iberville and North Robertson where he had disposed of the gun. The gun, a .357 magnum, was found. Upon returning to the homicide office, defendant gave a second tape-recorded statement in which he admitted shooting Mrs. Block. Prior to giving this statement, defendant was again advised of his rights.
On September 5, Mr. Block was shown three separate photographic lineups which included each of the suspects. Prior to viewing the lineups, Mr. Block stated that he had seen the pictures of defendant and Claiborne in the newspaper. He said that he looked at the pictures briefly and immediately recognized them. He stated he became physically ill when he saw the pictures and did not read the article. He further stated that seeing the pictures in the newspaper did not influence his identification. Mr. Block selected defendant's photograph out of one lineup and Claiborne's photograph out of another. He was unable to select McClow's photograph out of a third lineup, but he did narrow it down to three pictures, including McClow's.
Ballistics testing of the .357 magnum matched a test bullet fired by the gun to that of a bullet recovered from Mrs. Block's body.

LAW AND ANALYSIS
A review of the record reveals one error patent. The trial court sentenced defendant without observing the twenty-four hour delay period after denying defendant's pro se motion for new trial. C.Cr.P. art. 873. Because there is no indication in the record that defendant waived this delay, it is an error patent on the face of the record. In State v. Augustine, 555 So.2d 1331 (La.1990), the Supreme Court held that the trial court's failure to observe the twenty-four hour delay was not harmless error if the defendant challenged his sentence on appeal. In the present case, defendant does not challenge his sentence, and he does not assign as error the trial court's failure to observe the delay. Therefore, the failure to observe the delay is harmless. State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991).
In his first assignment of error, defendant complains that the trial court erred in denying his motion to suppress the confession on two bases. First, he argues that his two statements were not freely and voluntarily given because they were induced by threats. Second, defendant argues that because of his mental retardation and brain dysfunction he could not understand his constitutional rights and therefore knowingly and intelligently waive them.
Because we hold that the trial court erred in denying the motion to suppress the confession based on the second argument, we pretermit discussion of the first basis asserted as to trial court error in denying the motion to suppress the confession, as well as defendant's other assignments of error except one.
Diminished mental or intellectual capacity does not in and of itself vitiate ability to knowingly and intelligently waive constitutional *507 rights and make a free and voluntary confession. State v. Brooks, 541 So.2d 801 (La.1989); State v. Jackson, 600 So.2d 739 (La.App. 4th Cir.1992). Mental retardation is a factor to consider in deciding whether a person had the capacity to understand the rights explained. State v. Brown, 414 So.2d 689 (La.1982). Much weight should be given to the trial court's findings when the issue is whether the defendant was precluded by his diminished mental condition from understanding his rights and the consequences of waiving those rights. State v. Woods, 553 So.2d 985 (La.App. 4th Cir.1989), writ denied, 575 So.2d 385 (La.1991). Opinions of experts on the question of the waiver of constitutional rights may be helpful but are not binding on the trial court. There is no controlling psychiatric principle. State v. Lefevre, 419 So.2d 862 (La.1982).
The State has the burden of proving beyond a reasonable doubt that a confession was knowingly and intelligently waived. State v. Glover, 343 So.2d 118 (La.1977), on rehearing. The critical factor is whether the defendant was able to understand the rights being explained to him. State v. Anderson, 379 So.2d 735, 736 (La.1980).
In support of his claim that he did not knowingly and intelligently waive his rights, at the motion to re-open the suppression hearing defendant presented the testimony of Dr. Mark Zimmerman, qualified as an expert in forensic psychology. He testified that he spent about nine hours testing and interviewing defendant. Dr. Zimmerman administered the following tests on defendant: 1) Benton Visual Retention Test, a test of perceptual motor abilities; 2) screening test for, and the Luria Nebraska Neuropsychological Battery, a test for brain dysfunction; 3) Weschler Adult Intelligent Scale, an intelligence test; 4) Wide Range Achievement Test, a test of academic abilities; 5) Personality Assessment Inventory, an objective personality test; 6) Minnesota Multiphasic Personality Inventory, an objective personality test; 7) Rorschach, a projective personality test; 8) Mouse-Tree-Person Technique, a projective personality test.
Dr. Zimmerman found that defendant had an I.Q. of 65, which put him in the mildly mentally retarded range, or the educable range of retardation. Defendant's mental age is approximately ten years. Although defendant completed the ninth grade and was in the tenth grade when he dropped out of school, his functioning in reading and spelling is below the third grade level and in arithmetic is at the fifth grade level. Dr. Zimmerman also found brain dysfunction considering defendant's education level, with the parts of his brain affected being those associated with academic abilities and his ability to process informationhis intellectual abilities.
Dr. Zimmerman reviewed the waiver of rights form signed by defendant and went over it with defendant, and concluded that defendant found the form difficult to read and could not adequately explain many of the words on the form such as "privilege" and "waive". Reading the form to defendant at approximately the speed he heard on the taped confession, Dr. Zimmerman found that defendant could not keep up; he could not understand the form. Dr. Zimmerman stated that he thought defendant could be made to understand his Miranda rights, but it would be very difficult for him to understand using the wording on that particular waiver form. Dr. Zimmerman testified:
I don't believe he understood the rights as they were read to him or as I read them to him or as he read them, no.
Dr. Zimmerman's impression was that instead of his rights being something that he had and could keep, defendant believed that signing the waiver form was something that was done pro forma because he was arrested, that is, something he was supposed to do.
During cross-examination, Dr. Zimmerman stated that he could not see how any of his colleagues could find defendant not mentally retarded since he fit the criteria for retardation established by the Diagnostic and Statistical Manual of the American Psychiatric Association.
In his opinion, Dr. Zimmerman believed that defendant's personality would cause him to want to function at the level of his peers so he would attempt to portray himself as understanding things that he did not understand. *508 Dr. Zimmerman felt that defendant's desire to perform as a "normal" person was stronger than any propensity he would have to fake answers to the test in hopes of getting his confession excluded as evidence. Dr. Zimmerman was unaware that defendant had been previously "Boykinized."
The State presented no expert testimony to dispute Dr. Zimmerman's findings. At the motion to suppress hearing, and at trial, Detective Norman McCord testified that he was satisfied that defendant understood his rights, but he personally did not determine whether defendant could read or write. At trial, Detective Marco Demma testified that he verbally advised defendant of his rights. The trial court concluded that defendant knowingly and intelligently waived his rights and also noted that defendant had been "Boykinized" twice before.
Given the uncontradicted testimony of Dr. Zimmerman establishing defendant's mental retardation and his brain dysfunction, we cannot find that defendant made a knowing and intelligent waiver of his constitutional rights. With Dr. Zimmerman's testimony that defendant simply did not have the intellectual capacity to understand those rights and, in fact, did not understand his rights, the trial court clearly erred in refusing to suppress defendant's confession due to his diminished mental capacity. Considering all of the evidence presented, the State failed to prove that defendant knowingly and intelligently waived his constitutional rights prior to confessing to the murder of Pamela Block.
In his fifth and final assignment of error, defendant complains that the State impermissibly exercised six of its twelve peremptory challenges to exclude prospective jurors based on their race. He argues that the State failed to provide racially neutral reasons to justify the excusing of the jurors, thus entitling him to a new trial under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Following an order by this Court, the trial judge issued a per curiam identifying the racial composition of the jury in the present case as eight white persons and four black persons. A prosecutor's discriminatory use of peremptory challenges to exclude members of a defendant's race from a jury violates the equal protection rights of the defendant. Batson, supra; Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). It is also prohibited under Louisiana law. C.Cr.P. art. 795 C. Additionally, it is a violation of the potential juror's constitutional rights to exclude a juror because of his or her race even when that juror is not of the same race as the defendant. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
Batson set forth a three-part test to be used in determining whether a prosecutor exercised peremptory challenges in a discriminatory fashion. First, the defendant must demonstrate a prima facie case of purposeful discrimination. Batson, 476 U.S. at 96-97, 106 S.Ct. at 1722. He must establish that he is a member of a cognizable racial group, that the prosecutor has exercised peremptory challenges to remove other members of that race from the jury, and that these facts and other relevant circumstances raise an inference that the prosecutor used those challenges to exclude venire persons from the jury because of their race. State v. Collier, 553 So.2d. 815 (La.1989).[2]
Second, once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecution to give race-neutral reasons for the peremptory challenges. Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723. Those reasons need not rise to the level of a challenge for cause, but they must be more than the prosecutor's assertion of good faith or an explanation amounting to nothing more than a pretext for discrimination. State v. Knighten, 609 So.2d 950 (La. App. 4th Cir.1992). The neutral explanation must be one which is clear, reasonably specific, legitimate, and related to the particular case being tried. Collier, supra.
*509 Last, after the prosecutor has presented his reasons, the issue of fact is joined, and the trial court must assess the weight and credibility of the explanation in order to determine whether there was purposeful discrimination in the use of the peremptory challenges. Collier, supra. The trial court should not give "rubber stamp" approval of any non-racial explanation. Id. The ultimate burden of persuasion is on the defendant. Knighten, supra.
Unless the record indicates that a reasonable trial court must reach the conclusion that the prosecutor exercised peremptory challenges on the basis of the potential juror's race alone, the reviewing court should defer to the trial court, which has had the benefit of seeing and hearing the voir dire questions of the prosecutor and listening to the answers of the venire persons. State v. McNeil, 613 So.2d 752 (La.App. 4th Cir. 1993), writ granted in part, vacated in part 623 So.2d 1320 (La.1993). The trial court can best judge the courtroom atmosphere and the demeanor of the attorneys and prospective jurors. Id.
Therefore, the first issue is whether defendant established a prima facie case of discriminatory use of peremptory challenges by the State.[3] The voir dire transcript shows that after defense counsel made the Batson objection, the trial judge ordered the prosecutor to give his reasons for peremptorily challenging eleven of twelve African-American venire persons without first making an express ruling on whether defendant had established a prima facie case of discrimination. As noted in Collier, there would have been no need for the prosecutor to explain his challenges if the trial judge had not found a prima facie case of discrimination. Additionally, as noted in Knighten, the trial judge may have asked for the reasons to be given in the event the appellate court found that a prima facie case had been established.
Considering these circumstances, we find that defendant established a prima facie case of purposeful discrimination in the State's exercise of its peremptory challenges. As stated before, eleven of the State's twelve peremptory challenges were used to strike African-Americans. The jury was composed of eight whites and four blacks. The defendant was African-American. The victim, Pamela Beth Block, was white. The mere fact that four blacks sat on the jury does not defeat either defendant's Batson claim or an inference of discrimination. Collier, supra. Hence, it was incumbent on the State to give race-neutral reasons for the exercise of its peremptory challenges.
Although a total of eleven African-Americans were peremptorily challenged, defendant complains about the striking of only six of them. As to three of the prospective jurors, the State gave as its reason for striking them that they were weak or vacillated about the imposition of the death penalty. Another was challenged, according to the State, because her husband's uncle treated juveniles at the Juvenile Detention Center, and she thought the death penalty was severe. A fifth potential juror was struck because the State asserted that she was non responsive, very young, and might identify with defendant's family. The sixth prospective juror was struck, according to the State, because he worked for HANO, which related to the fact that there would be evidence about the Magnolia Housing Project, and that he had sat on a jury which voted a lesser verdict in a case involving the police.
After the State gave its reasons, the trial judge stated:
All right. I'm satisfied with the State's reasons for their peremptory challenges. I don't think that they were racially motivated, including there is a white challenge in there. I think he used all 12, 11 of which were on black persons acknowledged, and there was one on a white lady, a white female. I don't think that there has been shown any pattern of racial discrimination *510 here in the exercise of the peremptory challenges.
To determine whether the trial judge's decision was correct, we will review the voir dire of the six challenged jurors.
Nicole Summers (Juror No. 330) was one of the jurors challenged because the State asserted that she vacillated on imposition of the death penalty. Defendant argues that there is no basis for the State's assertion. When questioned by the State, Ms. Summers stated that she could consider the death penalty depending on the facts. When questioned by defense counsel about the death penalty, she stated:
Well, like I said earlier, I'm undecided with that. I'm not reallyI can I guess. But, like I say, it depends on the situation.
Considering Ms. Summers' equivocal position on the death penalty, it does not appear that the State's use of a peremptory challenge to excuse her was racially motivated.
Zina Ghoram (Juror No. 145) was peremptorily challenged because the State asserted that she was nonresponsive, very young, and might identify with defendant's family. It is not unconstitutional to exclude a juror for not being attentive or interested enough in the proceedings. Knighten, supra. Moreover, the trial judge is in the best position, by virtue of his observing the venire during voir dire, to know if this reason had merit. Id. We therefore defer to the trial court's determination that this reason was legitimate and not discriminatory.
Barbara Scarbrough (Juror No. 307) was challenged by the State on the grounds that she vacillated on the issue of the death penalty and that her responses were very weak on that issue. A review of her voir dire shows that she answered in the affirmative when asked by the State if she could consider imposing the death penalty. When questioned by defense counsel about how she felt about the death penalty, Ms. Scarbrough began to reply that she thought it was fair, but she was cut off by defense counsel. She was later asked a lengthy hypothetical question by defense counsel about mitigating factors as to sentencing such as a mental impairment or retardation and whether she agreed if a person suffering from mental retardation was capable of understanding the things that a normal person could. She answered in the affirmative. She was then asked if she agreed whether such a disability justified a life sentence and not execution. Ms. Scarbrough again answered in the affirmative.
In State v. Comeaux, 514 So.2d 84 (La. 1987), the Supreme Court ruled that the trial court correctly granted a challenge for cause as to two prospective jurors who stated in voir dire that they would not impose the death penalty against someone who was mildly mentally retarded even though they had initially no unalterable opposition to the death penalty. The court held that an unalterable opposition to the imposition of the death penalty on borderline retardates gave rise to valid challenge for cause. Since Ms. Scarbrough stated that she would not impose the death penalty on someone who was mentally retarded, which could have given rise to a challenge for cause, the State's exercise of a peremptory challenge to strike her is not an act of purposeful racial discrimination.
The State dismissed a third juror, Patricia Coston (Juror No. 90), on the grounds of vacillation on the death penalty. She answered in the affirmative when asked by the State if she could consider the death penalty. Ms. Coston was asked by defense counsel whether she was strongly in favor, moderately in favor, or had not thought about the death penalty. She replied that she was moderately in favor of it. Ms. Coston answered "No" when asked if a finding of guilty would be enough to impose the death penalty. She answered "Yes" when asked whether she would be interested in the defendant's background and family history and whether life imprisonment was a severe penalty. Considering the responses given by Ms. Coston, it is a very close question of whether the State's claim that she vacillated on the death penalty has any basis in the record. Her answers are consistent in favoring the death penalty, and there is nothing to show that she would oppose it under certain circumstances, like Ms. Scarbrough. We therefore defer to the trial court's finding that Ms. Coston was not excused for racially discriminatory reasons.
*511 Lisa Devezin (Juror No. 110) was peremptorily challenged because her husband's uncle treated juveniles at Juvenile Detention and she thought or commented that the death penalty was too severe. When questioned by the prosecutor, Ms. Devezin said that she could consider the death penalty. When asked by defense counsel, she admitted to being related to Dr. Armond Devezin, her husband's uncle. She was then asked if Dr. Devezin had ever discussed with her his involvement with juveniles in Juvenile Court, and she said "No." Defense counsel later asked Ms. Devezin how she felt about the death penalty. She replied that she thought it was severe but that she did not have any big problems with it. When asked about life imprisonment, she answered that she thought it was severe also but that she did not have any problems with it either. Upon further questioning by defense counsel, she answered that she thought it was possible to rehabilitate someone who had committed a serious crime. She answered "No" when asked if a finding of guilty would be enough for her to impose the death penalty. She stated that she would have to hear everything and know about the defendant's background and family history.
Ms. Devezin's voir dire answers do not support the State's reasons for peremptorily challenging her. With regard to her husband's uncle's work with juveniles, there is nothing in her answers to show that this would in any way affect her as a juror. As to the death penalty, her answers do not indicate weakness. The State did not rebut defendant's prima facie case of purposeful discrimination as to the striking of Ms. Devezin.
The final juror struck by the State was Alfred Price (Juror No. 273). He was peremptorily challenged because he worked for HANO and the case involved some evidence about the Magnolia Housing Project and because he had sat on a jury which returned a lesser verdict in a case involving the police. Mr. Price, a facility maintenance manager, was asked by the prosecutor whether he had occasion to work in the Magnolia Project, and he replied that he had not in the last twenty years. He then denied being acquainted with defendant or anybody who might be called as a witness. There is nothing in Mr. Price's voir dire about prior jury service.
Considering Mr. Price's voir dire responses, there is nothing to support the State's reason for peremptorily challenging him. The evidence in the case about the Magnolia Housing Project involved Joseph Davis, not defendant; and Davis's relationship to the case was fairly tangential. Moreover, Mr. Price had not been in that particular project for twenty years. Additionally, the statement about prior jury service is contradicted by the record. Hence, the State failed to rebut defendant's prima facie case of purposeful discrimination.
Because two of defendant's six Batson claims are meritorious, his conviction and sentence are reversed, and the case is remanded for a new trial. Additionally, because we find that the trial judge erred in denying defendant's motion to suppress his confession, the confession cannot be used at a new trial.
REVERSED AND REMANDED.
BYRNES, J., dissents with reasons.
BYRNES, Judge, dissenting with reasons.
I respectfully dissent from the majority's determinations relative to the defendant's inculpatory statements and the Batson complaint.
The majority concludes that the defendant did not knowingly and intelligently waive his constitutional rights prior to his murder confession based on the testimony of Dr. Mark Zimmerman. The records show that the trial court initially denied the defendant's motion to suppress the statements after a hearing in March, 1992. Thereafter, at a hearing held on July 21, 1992, in which the psychologist, Dr. Zimmerman testified, the trial court denied the defendant's motion to reopen the hearing on the motion to suppress the confession.
A defendant may not seek a rehearing to introduce new evidence once a trial court denies his motion to suppress. State v. Landry, 339 So.2d 8 (La.1976). In State v. *512 Thompson, 448 So.2d 666 (La.1984), reversed on other grounds 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246, on remand 466 So.2d 39 (La.1985), the Louisiana Supreme Court noted that the trial court could reconsider the motion to suppress limited to reargument without additional evidence. Reargument and reconsideration of the motion to suppress before trial based on evidence previously introduced should be sparingly made. State v. Martin, 509 So.2d 160 (La.App. 1 Cir.1987), writ granted 512 So.2d 446 (La. 1987), judgment reversed on other grounds 519 So.2d 87 (La.1988), appeal after remand 558 So.2d 654 (La.1990), writ denied 564 So.2d 318 (La.1990). See also State v. Marquez, 555 So.2d 636 (La.App. 4 Cir.1989). Because the new evidence provided by Dr. Zimmerman originated after the trial court's ruling on the motion to suppress was rendered, it cannot be considered.[1]
However, even if Dr. Zimmerman's testimony were considered, the state is not required to negate the defendant's abnormality but must prove beyond a reasonable doubt that the statement was voluntary. State v. Ashworth, 554 So.2d 271 (La.App. 3 Cir. 1989), writ denied 561 So.2d 113 (La.1990). Because of the statutory presumption of sanity and that one is responsible for his actions, the defendant has the burden of proving a mental defect which renders him unable to understand his rights and therefore incompetent to waive them. State v. Bordelon, 597 So.2d 147 (La.App. 3 Cir.), writ denied 600 So.2d 678 (La.1992). In reviewing the trial judge's ruling as to the admissibility of a confession, his conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Rodrigue, 409 So.2d 556 (La.1982), appeal after remand 437 So.2d 830 (La.1983). The testimony of police officers alone can be sufficient to prove the defendant's statements were freely and voluntarily given. State v. Pittman, 585 So.2d 591 (La. App. 5 Cir.), writ denied 586 So.2d 545 (La. 1991). Low intelligence does not vitiate a knowing and voluntary waiver of the defendant's rights. State v. Ondek, 584 So.2d 282 (La.App. 1 Cir.), writ denied 586 So.2d 539 (La.1991). Much weight is accorded the trial court's assessment of the defendant's intellectual ability to understand and waive his constitutional rights. State v. Lefevre, 419 So.2d 862 (La.1982); State v. Boothe, 532 So.2d 203 (La.App. 3 Cir.1988).
Dr. Zimmerman testified that Melvin Green was mildly retarded and had a brain dysfunction but was educable and had some ability to learn. Dr. Zimmerman was unaware that Melvin Green had been "Boykinized" before. Melvin Green had previously been arrested in other cases and had also been given his Miranda rights before. Further, the defendant did not enter a plea of not guilty and not guilty by reason of insanity in the present case. His attorneys did not ask for a sanity commission, indicating that defense counsel concluded that Melvin Green had the capacity to understand the proceedings against him and to assist in his defense, which further indicates that the defendant understood his waiver of rights when he gave his statements.
In State v. Brown, 445 So.2d 456 (La.App. 5 Cir.1984), although the sanity commission doctors agreed that the defendant's I.Q. was 54, that the defendant would not be a functional reader and his writing would be restricted, the appellate court upheld the trial court's ruling that the defendant's statement was admissible as freely and voluntarily given. See also State v. Istre, 407 So.2d 1183 (La.1981); State v. Walker, 558 So.2d 1346 (La.App. 4 Cir.1990); State v. Charles, 450 So.2d 1287 (La.1984). Considering that Melvin *513 Green was found to have an I.Q. of 65; that he was educable and had previously been through the police and court processing systems; that the officers testified that Melvin Green understood his rights and gave intelligible statements; under the totality of circumstances, the trial court properly concluded that Melvin Green voluntarily waived his rights and his statements were admissible.
The majority also concludes that Melvin Green is entitled to a new trial based on the finding that the state failed to rebut the defendant's prima facie case of purposeful discriminatory use of two of the State's peremptory jury challenges pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
To preserve a Batson complaint, the opposing party must make an objection before the entire jury panel is sworn. State v. Williams, 524 So.2d 746 (La.1988), appeal after remand, 545 So.2d 651 (La. 5 Cir.1989), writs denied 556 So.2d 53 (La.1990) and 584 So.2d 1157 (La.1991); Ambrose v. New Orleans Police Dept. Ambulance Service, 627 So.2d 233 (La.App. 4 Cir.1993). The minute entry dated July 21, 1992 reflects that after the jury was sworn and placed in the custody of the sheriff's deputies to be taken to a local motel, "(o)utside the presence of the jury, the defense noted an objection to the State's peremptory challenged (sic) pursuant to `Batson'." Considering that the defense failed to conclusively show that it objected before the jury was sworn, the objection is not timely, and the Batson challenge cannot be considered.
Furthermore, even if the Batson complaint were reviewed, the defendant failed to carry his burden of proving a prima facie case of purposeful discrimination. In State v. Thompson, 516 So.2d 349 (La.1987), certiorari denied by Thompson v. Louisiana, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), the Louisiana Supreme Court concluded that:
... the state did not exercise its peremptory challenges with a discriminatory purpose. Defendant is black and the state exercised each of its peremptory challenges against blacks. Nonetheless, four of the twelve jurors were black and each was selected before the state exhausted its peremptory challenges. Three other prospective black jurors were accepted by the state before it exhausted its peremptory challenges, but were excused by the defendant. This refutes an inference of discrimination. In addition, nothing in the prosecutor's questions or statements during voir dire supports an inference of discriminatory purpose. Thompson, 516 So.2d at 354.
In State v. Cannon, 572 So.2d 740 (La.App. 4 Cir.1990), writ denied 575 So.2d 821 (La. 1991), this court noted that:
... The trial court placed on the record the composition of the panel of prospective jurors, 37 black out of 50 or seventy-four percent black. By the time the prosecutor had exercised his eighth peremptory challenge the defense had peremptorily challenged four, three had been excused by the court, and twelve jurors had been selected. Because of the overwhelming number of blacks on the venire, most of those being challenged had to be black and possibly all those presented as prospective jurors were black. The record does not show the race of those individuals or of the twelve ultimately seated. (The state in its appellate brief informed this court that there were nine blacks, two whites, and one Asian on the jury, but this is not properly part of the record.) The defendant failed to show the racial make-up of the jury, and he does not suggest that it was inconsistent with the racial venire or the local population. Cannon, 572 So.2d at 742.
In the present case, the defendant failed to provide the racial make-up of the jury panel. This information was supplemented by the trial court pursuant to this court's order.[2] *514 The defendant does not show the total of the venire or its racial make-up. Nor does the record show whether the peremptory challenges were inconsistent with the racial venire or the local population or how many prospective Afro-American jurors were accepted by the prosecution but were excused by the defendant. Nothing in the prosecutor's questions or statements during voir dire supports an inference of a discriminatory purpose. Because the record is devoid of relevant circumstances beyond the naked facts that Melvin Green is black and the prosecution used peremptory challenges to exclude jurors on account of race, defendant failed to make out a prima facie case of purposeful discrimination.
Moreover, even if the state's challenges were considered, I cannot find that the defendant showed a systematic pattern of discrimination based on only one or two peremptory challenges. Furthermore, I cannot find purposeful discrimination by the state based on the majority's ruling with respect to two jurors, Lisa Devezin and Alfred Price.
In Knighten, 609 So.2d at 957, this court opined:
.... The reason given for a particular peremptory challenge may be trivial, irrelevant, frivolous, whimsical, or even contrary to our own sense of decency, but so long as it is race-neutral, "the defense has no standing to complain of how the State exercises its peremptory challenges." State v. Nix, 327 So.2d 301, 326 (La.1976); see also State v. Melton, 296 So.2d 280 (La.1974); State v. Smith, 263 La. 75, 267 So.2d 200 (1972). Our concern lies with judging not the integrity of the prosecutor's reasons, but rather the veracity of his explanation that he has not discriminated....
Although she could consider the death penalty, Lisa Devezin (Juror No. 110) stated that the death penalty was too severe. She also stated that she thought a penalty of life imprisonment was also severe. When questioned by defense counsel about the concept of rehabilitation, she agreed that she thought that rehabilitation is possible for someone who has committed a very serious crime. Ms. Devezin's responses concerning the death penalty do not measurably differ from those of Patricia Coston (Juror No. 90), whom the majority found to present a close question and the majority deferred to the trial court's finding that Ms. Coston was not excused for racially discriminatory grounds.
Additionally, Ms. Devezin stated that her uncle-in-law was involved with young people in Juvenile Court. Although this may not provide a challenge for cause, the conclusion that Ms. Devezin might identify with the young defendant from the influence of her relative provides another non-discriminatory reason for a peremptory challenge.
Furthermore, Ms. Devezin expressed a reluctance to serve on the jury because she had planned a vacation. She stated that she was traveling by car and did not have travel tickets; however, she agreed that she could give her full attention if picked for the jury panel. Thereafter when asked, "(w)ould you be able to concentrate on the testimony without thinking, `Gee, I'm missing my vacation because of this'?", Ms. Devezin replied, "It would be a distraction somewhat to me because I'm looking forward to this, you know."
In State v. Knighten, 609 So.2d at 955, this court stated:
... (I)t is not unconstitutional to exclude jurors for not being attentive or interested enough in the proceedings.... Because the trial record cannot indicate the attentiveness of the venire members during the voir dire, this Court must defer to the trial court's determination of whether this reason was legitimate and related to the particulars of the case.
Similarly in this case, this court should defer to the trial court's determination of whether Ms. Devezin would be attentive or interested in the proceedings. Considering that there were ample non-discriminatory grounds, the trial court properly concluded that there were legitimate non-discriminatory reasons for the state to use its peremptory challenge to excuse Ms. Devezin from the jury.
With respect to Alfred Price (Juror No. 273), this juror stated that he had worked as maintenance manager for HANO in connection with the Magnolia Project but not for the last 20 years. Although his employment *515 history may not have provided a reason to exclude Mr. Price for cause, it would present a strategic reason for the State to exclude him from the jury because Mr. Price might identify with Melvin Green. The record shows that Joseph Davis and three other juveniles who were initially arrested had ties with the Magnolia Project but Melvin Green lived on Green Street. His girlfriend's mother's house was located in the vicinity of the Magnolia Project at 2016 Louisiana Avenue, which Melvin Green initially identified as his house in his statement. The address of another defendant, Darrell Claiborne, was 1721 Louisiana Avenue. In the opening statement, the defense characterized the case as one in which, "(i)t is a middle class family killed by a project person." At trial the prosecution and the defense could have considered that the connection to the projects based on the different economic levels of the victim and the defendant provided a trial-related strategy for using a peremptory challenge.
Also, although Mr. Price was not asked if he served as a juror on prior cases, the record shows that during the hearing on the Batson claim, the prosecution stated that Mr. Price, "voted in a case in this Court, in "J" court, the jury voted on a police case of a lesser charge." In Knighten, supra, this court reviewed the state's challenge that a prospective juror had served on a jury in a prior case which returned a not guilty verdict. This court found that although one prospective juror was challenged, two others who voted the same were not excluded, showing that the prosecution did not pursue any trial-related strategy of striking jurors with the same characteristics.
In the present case where jurors serve for a period of one month, the trial judge, the prosecution, and the defense were aware of whether Mr. Price had served on a panel which delivered a not guilty verdict or a lesser verdict in a prior case during that month. The defense did not challenge the prosecution's statement and the trial court did not correct it. The transcript of the jury voir dire shows that the prosecutor challenged Rolanda Lacy, Keith Perkins, Patricia Coston, Frucella Tanner and Barbara Anderson, all of whom had been on prior juries and voted not guilty or guilty of a lesser charge. The state provided non-discriminatory legitimate strategic grounds to eliminate Mr. Price as well as other jurors with the same characteristics.
Because the defendant failed to show that the state systematically excluded jurors based solely on racial discrimination, the defendant should not be entitled to a new trial based on a Batson complaint. Furthermore, the defendant's inculpatory statements were admissible. The rulings of the trial court should not be overturned on appeal.
NOTES
[1] The trial court granted defendant's motion to sever his trial from that of Claiborne and McClow, as to whom the State later amended the bill of indictment to charge them with second degree murder. Claiborne was tried and found guilty of manslaughter; and, his conviction was affirmed by this court. State v. Claiborne, 624 So.2d 17 (La.App. 4th Cir.1993). The State entered a nolle prosequi as to McClow.
[2] Under Powers v. Ohio, supra it may no longer be necessary for the defendant to show that he is a member of a cognizable racial group. See State v. Knighten, 609 So.2d 950 (La.App. 4th Cir.1992); State v. Granier, 592 So.2d 883 (La. App. 4th Cir.1991), writ denied 600 So.2d 1334 (La.1992).
[3] It should be noted in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the United States Supreme Court stated that once the prosecutor gives race-neutral reasons for the challenges, the issue of whether a prima facie case was proven is moot. But in State v. Knighten, supra, this court decided to follow the Batson burden of proof analysis even if the issue were moot.
[1] Moreover, LSA-C.Cr.P. art. 703(G) provides:

G. When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement. (Emphasis added.)
[2] The trial court stated:

As best that can be ascertained by this Court, after phone consultation with three jurors and discussion with staff and with counsel, the racial composition of the jury was eight (8) white and four (4) black jurors. The Court should note, there is no formal record of this (emphasis added).
It should be noted that there may have been Hispanics on the jury panel but the trial court did not refer to this in its determination of the composition of the jury.